CITY OF CINCINNATI ex rel. COSGROVE et al., Appellees,

v.

GROGAN et al., Appellants.

[Cite as *Cincinnati ex rel. Cosgrove v. Grogan* (2001), 141 Ohio App.3d 733.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000221.

Decided March 16, 2001.

736

*Fay D. Dupuis,* City Solicitor, and *Mark Vollman,* Assistant City Solicitor, for appellee city of Cincinnati.

*Betty D. Montgomery,* Attorney General, *David M. Gormley,* State Solicitor, and *Matthew D. Miko,* Assistant Attorney General, for appellee state of Ohio.

*C.J. Schmidt* and *Eric C. Holzapfel,* for appellants.

PAINTER, Judge for the court on all but Grogan's Third Assignment.

In this case, we are asked to address primarily two issues: (1) whether an owner of a premises where felony drug offenses occur must actually participate in the drug offenses before the premises may be padlocked under the nuisance-abatement statutes, and (2) whether the nuisance-abatement statutes limit a

closure to a one-year period. As explained below, we hold that an owner's actual participation is not necessarily a prerequisite to closure. We also conclude that if closure is ordered, the nuisance-abatement statutes limit the closure to a one-year period.

## I. Procedural History

### A. The Petition

Appellees, the state of Ohio and the city of Cincinnati, through relators Ohio Attorney General Betty D. Montgomery and Cincinnati Prosecutor Terrence R. Cosgrove, filed a civil complaint under R.C. Chapter 3767 to close the Elder Café, a bar located in the Findley Market area of the city. The complaint alleged that the Elder Café, owned by appellants Jerome Grogan and Nate's Café, Inc., had been used for felony drug violations and, thus, constituted a nuisance under R.C. 3719.10. (For convenience, we refer to appellees as "the city," to appellants as "Grogan," and to the establishment as "Elder Café.") The complaint sought, in part, a permanent injunction under R.C. 3767.06.

The city filed Cincinnati Police Sergeant Jeff Hunt's affidavit, which contained complaints by neighbors and descriptions of illegal activities, arrests for misdemeanor and felony drug offenses that occurred from December 1998 through February 1999, and radio runs by police officers due to disturbances, all related to the Elder Café. Hunt stated that, in his professional opinion, notice of police entry into a building in which drug-related activity was suspected would create a risk of danger to the officers and would result in the destruction of evidence. His affidavit also referred to Grogan's tax documents, which were attached to the affidavit and reflected that Grogan was the president and statutory agent of Nate's Café, Inc. The attached deed indicated that Nate's Café, Inc., was the owner of the Elder Café.

### B. The Ex Parte Temporary Restraining Order

The city's attorneys filed a Civ.R. 65 certification, moved for an *ex parte* temporary restraining order, and also applied for a preliminary injunction seeking, in part, the closure of the Elder Café. (Although neither the trial court nor the parties were consistent in using the correct name, the nuisance-abatement statutes label what is ordinarily referred to as a "preliminary injunction" as a "temporary injunction.") The attorney certification reflected that illegal drug trafficking had taken place at the Elder Café over the past two years, that the drug trafficking had caused immediate and irreparable harm to the community, that the citizens of Ohio would suffer immediate and irreparable harm with no remedy at law if the order were not granted *ex parte*, and that exigent circumstances existed. The exigent circumstances included the following: dan-

ger to the lives of the police officers; destruction, removal, or concealment of evidence, contraband, and illegal narcotics; irreparable harm due to further illegal drug sales made in anticipation of subsequent police raids and closure; and illegal drug sales made as a result of delay. The certification also noted that Grogan's property rights would be protected by notice of the hearing on the application for a "preliminary" injunction, which was to be heard within ten days of the issuance of the temporary restraining order.[1]

The trial court granted the *ex parte* temporary restraining order ("TRO") and permitted the Elder Café to be closed and padlocked, as deemed necessary by the Cincinnati Police Department, to prevent its use for any purpose until a decision was made on the "preliminary" and permanent injunction. The next day, the Cincinnati police entered the premises, made an inventory of the bar, and boarded and padlocked the building. That same day, Grogan was served with the complaint and supporting affidavit, the *ex parte* TRO and supporting motion, the application for a "preliminary" injunction, and the Civ.R. 65 certification. The parties agreed to a continuance for the temporary-injunction hearing.

Meanwhile, Grogan moved to dissolve the TRO and to strike Hunt's affidavit. He supported his motion with his own affidavit. He also requested a bond so that the business could continue operations under R.C. 3767.04(C).

The trial court (1) granted the city's application for a "preliminary injunction," as mandated by R.C. 3767.04(B)(3), when Grogan requested a continuance, (2) denied Grogan's request to remain in operation pursuant to R.C. 3767.04(C), and (3) set a hearing on the city's application for a permanent injunction. It dismissed, as moot, Grogan's motion to dissolve the TRO. On March 1, 1999, the parties agreed to have the temporary-injunction hearing held on March 9, 1999, one day later than originally scheduled. (The entry was apparently signed by Grogan's counsel on behalf of the city by telephone authorization on February 26, 1999.) Without objection from Grogan as to the length of any delay, a determination on the temporary injunction was made on March 18, 1999. Thus, the Elder Café was padlocked from February 26, 1999, through March 18, 1999 (twenty-one days), under the *ex parte* TRO.

## C. Grogan's Counterclaims

Grogan counterclaimed against the city, alleging that the city had violated Grogan's civil rights under Section 1983, Title 42, U.S.Code, his state constitutional rights to due process and equal protection, and his state and federal statutory rights to privacy. The parties submitted several motions, including motions for summary judgment. The trial court granted summary judgment in favor of the

---

1. See R.C. 3767.04(B)(1).

city on Grogan's counterclaims and denied all other motions, including Grogan's motion for a jury trial on the nuisance claim.

### D. The Permanent Injunction

Almost one year from the date the city had filed its complaint, the trial court heard the city's application for a permanent injunction. After a two-week trial, the court granted the injunction and ordered the Elder Café to be padlocked for one year, beginning March 14, 2000.

## II. Grogan's Appeal

In his appeal, Grogan raises five assignments of error. He claims that the trial court erred by (1) granting the city an *ex parte* TRO; (2) granting the city discretion to padlock the Elder Café; (3) granting the city summary judgment on his counterclaims; (4) denying his request for a jury trial; and (5) padlocking the Elder Café for two years.

### A. The Ex Parte Temporary Restraining Order

■ In his first assignment, Grogan argues that the trial court erred by granting the *ex parte* TRO that allowed the city to padlock Elder Café. Specifically Grogan makes two arguments: (1) that there were no exigent circumstances to justify the denial of his due-process rights to proper notice and an opportunity to be heard, and (2) that this issue was not waived.

The city moved for an *ex parte* TRO based on exigent circumstances. The lack of notice, according to the city's Civ.R. 65 attorney certification, was necessary to prevent danger to the police officers who would be involved in the closure, destruction of contraband and the removal or destruction of personal property, and irreparable harm due to illegal drug sales that would be conducted in anticipation of the police raid and facilitated by any delay in the closure of the premises. Because the *ex parte* order was preempted by the "preliminary" or temporary injunction, and Grogan has not demonstrated any prejudice, we question whether there is any basis to invalidate the TRO.[2]

But even before we get to the merits of Grogan's argument, we must express concern about the city's use of Civ.R.65 to contravene the plain language of the abatement statutes. R.C. 3767.04(B)(2) allows a trial court to issue an *ex parte* TRO *if* an application for a temporary injunction is filed. (A hearing on an application for a temporary injunction must occur within ten days after the filing

---

2. Accord *State ex rel. Eckstein v. Video Express* (1997), 119 Ohio App.3d 261, 271, 695 N.E.2d 38, 45.

of the application.[3]) The *ex parte* TRO under the statute limits the trial court's authority to "restraining the defendant and all other persons from removing or in any manner interfering with the personal property and contents of the place where the nuisance is alleged to exist until the decision of the court or judge granting or refusing the requested temporary injunction and until further order of the court."

Five days before the hearing on an application for a temporary injunction, the defendant must be served with a copy of the abatement complaint, the application for the temporary injunction, and notice of the time and place of the hearing.[4] If the defendant requests a continuance of the hearing, the temporary injunction must be granted as a matter of course.[5] If the hearing is had and the court is satisfied that the allegations in the complaint have been sustained, the court must enter a temporary injunction. The statute allows the trial court to issue a closure order *at the time it grants the temporary injunction if it appears that the defendant has received five days' notice* of the hearing and has not demonstrated to the satisfaction of the court that the nuisance has been abated.[6]

A closure order issued under a temporary injunction is effective until a "final decision is rendered on the complaint for the requested permanent injunction."[7] The closure order shall also continue in effect any restraining order already issued under R.C. 3767.04(B)(2) until a decision is made on the permanent injunction. If a restraining order has not been issued, the closure order must also restrain "the removal or interference with the personal property and contents located in the place" until a decision is made on the permanent injunction.[8]

The owner "of any real or personal property closed or restrained or to be closed or restrained" may appear before the court any time between the filing of the complaint for a permanent injunction and the hearing on the complaint, and may be allowed to file a bond. If the owner convinces the trial court that the nuisance will be abated, the trial court may "discharge or refrain from issuing at the time of the hearing on the application for the temporary injunction any order

---

3. See R.C. 3767.04(B)(1); *State ex rel. Pizza v. Rayford* (1992), 62 Ohio St.3d 382, 384, 582 N.E.2d 992, 994, fn. 2.

4. See R.C. 3767.04(B)(3).

5. See *id.*

6. See *id.*

7. See *id.*

8. See *id.*

closing the real property or restraining the removal or interference with the personal property."[9]   R.C. 3767.06(A) allows for the continuation for one year of "any closing order issued at the time of the granting of the temporary injunction." If a closing order is not granted when the temporary injunction is issued, the abatement order must include a one-year closing.[10]

The language of the statutes clearly contemplates that closure is to occur only where the defendant has had five days' notice of the temporary-injunction hearing, and where the defendant has failed to show abatement of the nuisance. Further, under the statute, an *ex parte* TRO may keep a "defendant and all other persons" only from removing personal property and contents from the place the nuisance is alleged to be occurring.   The language of R.C. 3767.06(A) regarding the timing of the closure order supports this reading of the statute.

In spite of the clear limitation the abatement statutes place on an *ex parte* TRO, courts, including the Ohio Supreme Court, have allowed complainants to circumvent the limitation by using Civ.R. 65.[11] In *State ex rel. Pizza v. Rayford,* the state moved for a temporary restraining order and a temporary injunction under R.C. 3767.04 and Civ.R. 65, and sought to have the premises padlocked until the trial court took further action on the state's nuisance complaint.   The trial court granted the *ex parte* TRO and ordered the premises padlocked pending a decision on the temporary injunction and a permanent injunction. After the hearing on the temporary injunction, the court ordered the premises closed and padlocked pending a decision on the complaint.

The issue raised in *State ex rel. Pizza v. Rayford* was whether the failure to hold a preliminary-injunction hearing within ten days in contravention of R.C. 3767.04 was reversible error.   The Supreme Court determined that it was not. R.C. 3767.04 requires a trial court to hold a hearing "within ten days after the filing" of the preliminary-injunction application.   The state argued that Civ.R. 65, not the statute, was controlling.   Under Civ.R. 65, the expiration of the temporary restraining order was when the court was required to, and did, hold a hearing.

The Supreme Court recognized that a temporary injunction and an *ex parte* TRO are "two entirely independent forms of relief."[12]   It also recognized that "the statute suggests that an application for a [temporary injunction] is a

---

9.   See R.C. 3767.04(C)

10.   See R.C. 3767.06(A).

11.   See *State v. Ramey* (Sept. 3, 1999), Clark App. No. 99CA0002, unreported, 1999 WL 957650; *State ex rel. Pizza v. Rayford, supra.*

12.   See *State ex rel. Pizza v. Rayford* at 384, 582 N.E.2d at 994.

prerequisite to the issuance of an *ex parte* TRO preventing interference with the property alleged to be a nuisance * * *."[13]   In spite of that, the Supreme Court also stated that "the [trial] court properly granted the state's request for a TRO that resulted in the closing and padlocking of the property in question, to preclude appellee and others from interfering with the property until the [temporary] injunction hearing."[14]

■   Based on *State ex rel. Pizza v. Rayford* and in spite of the language of R.C. 3767.04, an *ex parte* TRO is available under Civ.R. 65 to padlock property alleged to be a nuisance.

In *State ex rel. Pizza v. Rezcallah,*[15] however, the Ohio Supreme Court indicated that any prehearing padlocking of property requires a showing of "exigent" circumstances.   It also acknowledged that the seizure of real property based solely on the fact that illegal drug activity has occurred in a residence may not comport with the Due Process Clause of the United States Constitution.[16]   It relied on *United States v. James Daniel Good Real Property*[17] to support its pronouncement.   But the United States Supreme Court seems to recognize a difference between a prehearing civil forfeiture of real property and the issuance of an order like the *ex parte* TRO in this case.   In fact, the Supreme Court has concluded that, to demonstrate "exigent" circumstances, the federal government must show that less restrictive means to protect its interests under the federal civil-forfeiture statute would be insufficient.   Such less restrictive measures include the filing of a notice of *lis pendens* to prevent the sale of the real property or the issuance of an *ex parte* restraining order to prevent destruction of the property.[18]   The court has also distinguished between the forfeiture of real property that cannot be removed or concealed and the forfeiture of property that can be destroyed, concealed, or removed if advance warning is provided.[19]

---

13.   See *id.*

14.   See *State ex rel Pizza v. Rayford* at 385, 582 N.E.2d at 995.

15.   See *State ex rel. Pizza v. Rezcallah* (1998), 84 Ohio St.3d 116, 117, 702 N.E.2d 81, 84, fn. 1.

16.   See *id.*

17.   See *United States v. James Daniel Good Real Property* (1993), 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490.

18.   See *United States v. James Daniel Good Real Property* at 58, 114 S.Ct. at 502, 126 L.Ed.2d at 506.

19.   See *United States v. James Daniel Good Real Property* at 52, 114 S.Ct. at 500, 126 L.Ed.2d at 502.

In this case, the city obtained an *ex parte* TRO under Civ.R. 65. Civ.R. 65 allows TROs to be "issued *ex parte* without notice in an emergency situation 'to last only long enough for a hearing.' "[20] Under the facts of this case, the trial court granted the *ex parte* TRO based upon averments that notice to the Elder Café would place police officers in danger and would result in the removal of personal property and the destruction of contraband. The Elder Café was located in a high-crime area. Its neighbors had complained about the unruly conduct of the clientele frequenting the bar, and an unsolved homicide had occurred inside the bar in the recent past. Several drug offenses also had taken place in and around the bar. We conclude, solely for the purposes of this case, that the city demonstrated the requisite emergency circumstances. Because of our disposition of Grogan's first argument, we need not address whether the lack-of-exigent-circumstances issue was waived in the court below.

*B. Participation in Felony Drug Offenses Is Not Necessary for Abatement*

In Grogan's second assignment, he argues that the trial court erred when it granted the city discretion to padlock the property because the city had failed (1) to prove that Grogan had participated in any felony drug offenses, (2) to prove that he had any knowledge of the alleged felony drug transactions and that he had acquiesced to them, and (3) to respond to his requests for admissions in a timely manner.

The city alleged that the Elder Café constituted a nuisance under R.C. 3719.10, which states that "[p]remises or real estate * * *, on which a felony violation of Chapter 2925. * * * of the Revised Code occurs constitute a nuisance subject to abatement pursuant to Chapter 3767. of the Revised Code." R.C. Chapter 3767 sets forth the procedures to abate and enjoin a nuisance.

To establish that a nuisance exists, R.C. 3719.10 requires the state to prove by clear and convincing evidence "that felony violations of R.C. Chapter 2925 chronically occur on a parcel of property."[21] R.C. 3767.02 "does not require proof * * * of acquiescence to, or participation in the creation or perpetuation of a nuisance in order to find an owner of a nuisance guilty of the civil offense of maintaining a nuisance."[22] But "[p]roof of an owner's knowledge, acquiescence,

---

20. See *Bexley v. Duckworth* (Mar. 7, 2000), Franklin App. No. 99AP–414, unreported, 2000 WL 249121.

21. See *State ex rel. Miller v. Anthony* (1995), 72 Ohio St.3d 132, 140, 647 N.E.2d 1368, 1374.

22. See *State ex rel. Pizza v. Rezcallah* at 116, 702 N.E.2d at 83, paragraph one of the syllabus.

or participation is relevant * * * in determining which statutory remedies may be imposed once the owner is found guilty of maintaining a nuisance."[23]

According to Grogan, the holding of *State ex rel. Pizza v. Rezcallah*[24] required the city to prove that he had participated in the felony drug offenses themselves before the bar could be closed under the abatement statutes. Grogan relies on the fact that the second syllabus paragraph of *Rezcallah* uses the conjunction "and" when referring to participation:

"To the extent that R.C. 3767.06(A) requires a trial court, upon a finding of a nuisance, to issue an injunction closing property against its use for any purpose for one year, and to the extent that it allows release from such injunction only through the filing or renewal of a bond in the full value of the property, the statute violates the Fourteenth Amendment Due Process Clause and the Fifth Amendment Takings Clause of the United States Constitution, and Section 19, Article I of the Ohio Constitution, when applied to an owner who did not negligently or knowingly acquiesce to, and did not participate in the creation or perpetuation of the nuisance."

We understand the difficulty of deciphering this 113–word sentence. But the syllabus is the law,[25] so we must attempt to translate it.

*Rezcallah* involved three separate defendants whose property had been pad-locked under R.C. Chapter 3767. One of the defendants was a landlord whose tenant was selling drugs from her property. Another of the defendants was a property owner who had invited a guest into his home. The guest would not leave and sold drugs from the house. The owner filed charges against the unwanted guest and finally abandoned the house to the guest. The third defendant owned a residence, occupied by her brother, who orchestrated drug sales from the house. It was undisputed in all the cases that the owners neither acquiesced nor participated in the drug transactions, and that all three took affirmative action to investigate drug allegations and to remove the dealers after discovering that drugs were being sold from their property.

The court first answered the question of what must be demonstrated to show a nuisance under R.C. 3767.02. It held in the first paragraph of the syllabus and stated in the text that "R.C. 3767.02 does not require a finding of acquiescence to *or* participation in the creation or perpetuation of a nuisance on the owner's

---

**23.** See *id.* at 122, 702 N.E.2d at 87.

**24.** *State ex rel. Pizza v. Rezcallah, supra.*

**25.** See S.Ct.R.Rep.Op. 1(B); *Cassidy v. Glossip* (1967), 12 Ohio St.2d 17, 41 O.O.2d 153, 231 N.E.2d 64, paragraph six of the syllabus.

property in order to find an owner guilty of maintaining a nuisance."[26]  This holding allows a court to find that an innocent owner has maintained a nuisance.

The court concluded in the body of its decision that "to the extent that R.C. 3767.06(A) mandates the imposition of a closure order directing the effectual closing of the place where a nuisance is found to exist against its use for any purpose for a period of one year, or requires the filing or renewal of a bond in lieu of such a closure order, *when the owner of the property bears no culpable responsibility in the nature of acquiescence to or participation in the creation or perpetuation of the nuisance, the statute violates the Fourteenth Amendment Due Process Clause and the Fifth Amendment Takings Clause of the United States Constitution, and Section 19, Article I of the Ohio Constitution.*"[27]  The court further concluded, "We hold * * * that the mandatory closure provisions of R.C. 3767.06(A) do not substantially advance [the prevention of illegal drug activity] when imposed against property owners who have not acquiesced to *or* participated in the illegal activity, and who have promptly abated the nuisance upon its discovery."[28]  It also stated that "if, despite, a finding of guilt, the court determines that a defendant owner acted in good faith, was innocent of any acquiescence to *or* participation in the conduct establishing the nuisance, and took prompt action to abate the nuisance, no closure order shall be issued under R.C. 3767.06(A) and no tax shall be imposed pursuant to R.C. 3767.09."[29]

■  The Ohio Supreme Court's holding in *Rezcallah* clearly seeks to protect an innocent property owner from having his or her property forfeited.  The syllabus language thus defines, for purposes of the constitutionality of a one-year closure, what constitutes an innocent property owner.  An innocent property owner is one who "[has] not negligently or knowingly acquiesce[d] to, and [has] not participate[d] in the creation or perpetuation of the nuisance."

■  Obviously, if a property owner either acquiesced in the felony drug offenses or participated in the creation or perpetuation of them, the owner would not be innocent.  The syllabus does not require a petitioner to establish negligent or knowing acquiescence *and* participation before closure may occur.  Either acquiescence or participation takes an owner out of the innocent category.  If both acquiescence and participation were required to be proven, an owner who

---

26.  See *State ex rel. Pizza v. Rezcallah* at 120, 702 N.E.2d at 86 (emphasis added).

27.  See *id.* at 124, 702 N.E.2d at 88 (emphasis added).

28.  See *id.* at 129, 702 N.E.2d at 92 (emphasis added).

29.  See *id.* at 132, 702 N.E.2d at 94 (emphasis added).

sold drugs on his property, but who did not acquiesce to others selling drugs, would be free from an order of closure. Just as we may not interpret statutes to reach an absurd result, we will not interpret a Supreme Court syllabus to reach an absurd, and unintended, result.

The *Rezcallah* syllabus compounds the ambiguity by using "and" where "or" would have better conveyed the meaning intended. The body of the decision uses "or" in every reference to the same proposition. Surely, we may use the body of the Supreme Court opinion to interpret the syllabus, when the syllabus may permit two interpretations.

Our interpretation is the most reasonable way to reconcile the language in the body of the text with the syllabus language. To be an innocent owner who is afforded constitutional protection against closure, the owner may neither acquiesce to felony drug offenses occurring on his property nor participate in creating or perpetuating the drug dealing. If the owner does either of these, the owner is not an innocent owner.[30]

### C. Competent, Credible Evidence of Acquiescence

Grogan argues that the record fails to demonstrate that he acquiesced to the felony drug offenses. He argues that he had no knowledge of the felony drug arrests that the city proved, because the police had never informed him of the drug arrests and because the arrests had taken place outside his establishment. He also presented evidence that his bar was a nice, quiet place, and that his employees did not know that drug transactions occurred in the bar. He also argues that the state's witnesses were not credible based on their prior testimony.

Grogan testified that he was frequently on the premises, but spent the majority of the time in his second-floor office. He testified that he had attempted to abate the nuisance by installing a camera (that was infrequently monitored) and a mirror, placing signs around the bar, and refusing to serve certain undesirable people.

The state presented evidence that Grogan paid his employees, whom he expected to monitor drug activities, less than minimum wage; that one of his bartenders was a drug user; and that Grogan was present on the premises for only short periods of time during the morning hours.

---

**30.** Accord *State ex rel. Freeman v. Pierce* (1991), 61 Ohio App.3d 663, 671, 573 N.E.2d 747, 752, fn. 2 ("[Acquiescence and participation] are most often used in a mutually exclusive sense, in that one requires a failure to object or to protest, and the other a positive act.").

The state also presented evidence that several felony arrests had occurred as the result of drug violations that took place in the Elder Café during a thirty-eight-day period. The state also presented evidence that the smell of marijuana was pervasive and that drug transactions appeared to be constantly occurring in the entranceway of the Elder Café. Police officers testified that they had conducted drug sweeps in the bar, had confiscated marijuana, cocaine, and heroin, and had observed ground-out marijuana butts on the floor and tables of the bar, and further stated that they had spoken to Grogan's employees about the narcotics problem in the bar getting out of hand. Neighbors testified that suspicious drug activity took place right outside the bar.

Further, Grogan was informed, at a July 1998 public hearing conducted before the Ohio Department of Liquor Control, that drugs had been recovered from and sold at the Elder Café. (The hearing resulted from the Cincinnati City Council objecting to the renewal of Grogan's liquor permit. The hearing examiner denied the renewal in September 1998. Grogan appealed, and the denial of the renewal of the liquor permit was affirmed. It is not clear from the record whether a stay was obtained to permit the operation of the Elder Café as a bar. Grogan's deposition indicates that the Elder Café apparently was operating as a bar until at least October 1999.) Grogan also had in his possession the order from that hearing, which indicated that drug dealers were seen coming in and out of the bar on a regular basis, and that witnesses had testified to seeing marijuana and cocaine sales inside and immediately outside the bar. Grogan testified that, after the Liquor Control Board hearing, he was aware of the allegations of drug dealing and that drugs had been recovered from the Elder Café, but that he did not believe the allegations.

## D. Burden of Proof

To obtain a nuisance-abatement order, the relator must prove its allegations by clear and convincing evidence.[31] In this case, the city had the burden to prove by clear and convincing evidence that "chronic felony violations" of R.C. Chapter 3719 had occurred on the premises and that Grogan "knew of the drug offenses, and either participated in them, or acquiesced in their occurrence."[32] To meet its burden of proving knowledge and acquiescence to or participation in the drug offenses, the city could offer direct evidence, evidence of the general reputation of the Elder Café, and "an admission by or a finding of guilt of any person under the criminal laws [of felony-drug offenses] at the site of

---

31. See *State ex rel Freeman v. Pierce* at 669, 573 N.E.2d at 752.

32. See *id.* at 670, 573 N.E.2d at 752.

the alleged nuisance."[33]  The means of proof, other than by direct evidence, would "create a rebuttable presumption of knowledge and acquiescence or participation under R.C. 3767.05."[34]

The city presented clear and convincing proof of the general reputation of the Elder Café and of convictions for felony drug offenses that had occurred at the Elder Café.  This created a rebuttable presumption of acquiescence.  Grogan presented evidence contrary to the city's evidence.  Thus, Grogan's challenge on appeal goes to the weight of the evidence supporting the trial court's judgment.

## E.   Weight of the Evidence

The standard of review for manifest-weight issues in civil cases is that "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."[35]  Further, we must presume that the findings of the trial court are correct based on the rationale that "the trial [court] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."[36]

Because there is competent, credible evidence from which the trial court could have inferred in this case that Grogan had acquiesced to felony drug offenses by "burying his head in the sand," we find no merit in his manifest-weight challenge. Further, were we to review the evidence under the standard set forth in *State v. Thompkins* (1996), 75 Ohio St.3d 558, 664 N.E.2d 926, we would still come to the same conclusion, because the trial court did not lose its way and create a manifest miscarriage of justice in concluding that Grogan had acquiesced to the drug offenses.

## F.   Request to Admit

In his third argument under this assignment, Grogan contends that the trial court abused its discretion by refusing to deem as an admitted fact the following statement appearing in his requests for admissions: "Relators did not inform Grogan of any felony arrests at the Elder Café between December 30,

---

33.  See *State ex rel. Pizza v. Carter* (C.P.1993), 63 Ohio Misc.2d 235, 239, 622 N.E.2d 1194, 1198.

34.  See *id.*

35.  See *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, paragraph one of the syllabus.

36.  See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276.

1998, and February 25, 1999." The state of Ohio did not respond to the request and the city responded late. At a hearing, the city argued that its late response also pertained to the state of Ohio because both were jointly prosecuting the case. The trial court refused to find that the city had admitted that Grogan had not been informed of any felony arrests between December 1998 and February 1999. It stated that the city had argued from the beginning that Grogan had notice of "the events." It did not find that the state had admitted the fact, because it would not make any sense to admit the fact against the state, but not against the city.

Civ.R. 36(B) allows a court to permit withdrawal of an admission "when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits." (Civ.R. 36 did not require the city to file a written motion for withdrawal, nor did it explicitly require that a motion be made at a particular time.[37]) A trial court thus has the discretion under Civ.R. 36(B) to act "to serve what [it] believe[s] to be the best interests of justice."[38] Because the rule allows the trial court discretion to permit an amendment or a withdrawal of an admission, we may only reverse such a decision when the trial court has abused that discretion.[39]

In this case, the court obviously recognized that the presentation of the merits would be enhanced when it determined that Grogan's "knowledge" had been contested from the beginning, and that to admit the fact against the state but not the city would be senseless. Further, Grogan failed to produce any evidence to show that he would have been prejudiced in maintaining his defense. The fact that Grogan allegedly did not know of the felony arrests did not demonstrate, under the standard of R.C. 3719.10, that he did not know that felony drug violations had occurred on the premises.[40] (Further, there was no dispute at trial that Grogan had not been informed of the arrests.) Thus, we conclude that the trial court did not abuse its discretion in refusing to recognize as an admission the statement contained in Grogan's request.

---

**37.** See *Balson v. Dodds* (1980), 62 Ohio St.2d 287, 290, 16 O.O.3d 329, 331, 405 N.E.2d 293, 296, fn. 2.

**38.** See *Nursing Staff of Cincinnati, Inc. v. Sherman* (1984), 13 Ohio App.3d 328, 330, 13 OBR 406, 408, 469 N.E.2d 1031, 1033–1034.

**39.** Accord *Amer, Cunningham, Brennan Co., L.P.A. v. Sheeler* (Apr. 28, 1999), Summit App. No. 19093, unreported, 1999 WL 247110; *Tabor v. Westfield Cos.* (Feb. 27, 1998), Gallia App. No. 97CA05, unreported, 1998 WL 90899.

**40.** See *State ex rel. Freeman v. Pierce* at 668–669, 573 N.E.2d at 751.

### G.  Insufficient Steps to Abate

In his fourth issue, Grogan argues that because he had taken steps to control illegal drug activity at the Elder Café, he could not have acquiesced to the activity.  The trial court recognized that Grogan had taken some steps to eliminate the problem, but determined that the steps were inadequate, insufficient, and "minimal."  It concluded that Grogan had not made "an honest or reasonable effort to abate" the nuisance.  The evidence demonstrated that Grogan had fired the "floor walker" to make a point to other employees;  that he had installed a camera in the pool room;  that he had changed the glass in the front door;  and that he had increased the time he spent at the bar.  He had also reminded his employees that drug transactions were prohibited and posted a sign forbidding disorderly conduct.

The trial court determined that the video camera was monitored only periodically, and that little was taped.  It referred to Grogan as an absentee landlord who "might as well not have been there for all the usefulness that he was to this operation.  He did not get in the bar, serve the drinks, or watch the customers and so forth."  The trial court also found that the salary that Grogan paid his employees, who were from the same neighborhood as the patrons, did not provide "any great incentive to them to stand up to drug dealers or anybody else or even to look for drug dealers."  According to the trial court, the evidence demonstrated that Grogan would not talk to police, did not ask for advice, and did not believe that there was a problem on the premises.

Grogan's argument is another challenge to the weight of the evidence.  Because there is competent, credible evidence to support the trial court's conclusions, we will not reverse its judgment.  We overrule Grogan's second assignment.

### III.  Counterclaims

### A.  Section 1983, Title 42, U.S.Code

In Grogan's third assignment, he contends that the trial court erred by granting summary judgment in the city's favor on his counterclaims.  He argues that the padlocking of the Elder Café under the *ex parte* TRO gave rise to a claim under Section 1983, Title 42, U.S.Code, because the padlocking violated the Takings Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment.  He also argues that the padlocking was a taking of property in violation of Section 19, Article I of the Ohio Constitution.  Grogan supports these claims with the arguments that *State ex rel. Pizza v. Rezcallah* required a showing that he had participated in the drug felonies, and that the *ex parte* TRO could not be validly based on drug activities.

■ Although the trial court based its ruling on the fact that the city was not the moving force behind the TRO, we believe that summary judgment was appropriate because there was no genuine issue of material fact and the city was entitled to judgment as a matter of law. As discussed in prior sections of this opinion, Grogan's legal arguments have no merit. Violations of due process and takings of property without justification do not occur where an *ex parte* TRO is supported by exigent circumstances, and where the law does not require a property owner to participate in felony drug transactions before its property may be closed.

■ Grogan also argues that the trial court granted the city discretion on whether to close the Elder Café. But, as the trial court pointed out in its entry, any discretion was limited to the means for effectuating the closure—boarding up the building or padlocking it. This "discretion" did not give rise to a constitutional violation.

### B. Jury Trial

■ In his fourth assignment, Grogan challenges what he views as the trial court's denial of his right to a jury trial on the issue of whether he was an innocent owner. The Ohio Supreme Court has held that there is no right to a jury trial in a nuisance-abatement action.[41] In its view, "The confiscation and sale of personal property used in maintaining a nuisance and the imposition of a one-year closing order pursuant to R.C. 3767.06 as well as the imposition of the tax required by R.C. 3767.08 are preventative measures, not penalties imposed for past criminal conduct. Inclusion of these provisions within the nuisance abatement framework does not transform nuisance abatement actions into legal actions to which the right to a jury trial attaches."[42]

### IV. Closure Duration

■ In his fifth assignment, Grogan argues that the trial court erred by imposing a two-year closure on the Elder Café. The court ordered that the closing was to extend for one year from the date of its determination on the permanent injunction. The practical effect of the order was that the Elder Café would be padlocked for two years. Grogan argues that the padlocking could only be limited to a one-year period under R.C. 3767.06. We agree.

R.C. 3767.04(B)(3) allows for a temporary closure order, but the order "is limited to the prevention of prohibited activity and does not authorize the court to

---

41. See *State ex rel. Miller v. Anthony*, paragraph one of the syllabus.

42. *Id.* at paragraph two of the syllabus.

order an 'effectual closing * * * against its use for any purpose' (R.C. 3767.06[A]) via padlocking or otherwise."[43] A temporary closure order may be discharged "if the owner posts a bond for the full value of the property and fulfills the other requirements listed in R.C. 3767.04(C)."[44] The Ohio Supreme Court in *Rezcallah* explained that if the existence of a nuisance is established in a civil action, "the court 'shall' enter judgment that 'perpetually enjoins the defendant and any other person from further maintaining the nuisance at the place complained of and the defendant from maintaining the nuisance elsewhere.' R.C. 3767.05(D). R.C. 3767.06(A) also requires that an 'order of abatement shall be included in the judgment entry.' Because both R.C. 3767.05(D) and 3767.06(A) use the imperative word 'shall,' these provisions are deemed mandatory."

The abatement statute, according to *Rezcallah*, mandates that "where the owner has not provided a bond prior to the trial on the merits, and where no prior closure order was issued against the use of the property, the order 'shall' direct closure of the real property against use for any purpose for one year."[45] If no bond was furnished, and a closing order was issued at the time of the granting of the temporary injunction, that order "shall continue for one year."[46] (In this case, the trial court denied Grogan's request for a bond and granted the temporary injunction.) *Rezcallah* makes clear that the "padlocking [of] an owner's property, effectively closing it against all uses"[47] is limited to one year. The trial court here initially closed the Elder Café under a Civ.R. 65 *ex parte* TRO on February 26, 1999. The law mandates, under these facts, that the court's abatement order "shall continue for one year any closing order issued at the time of granting the temporary injunction." Thus, where the *ex parte* TRO was substituted for the temporary injunction under the nuisance-abatement statutes, the Elder Café could be closed for all purposes only until February 26, 2000. Thus, we sustain Grogan's last assignment of error.

## V.  Conclusion

We affirm the trial court's judgment except to the extent that it orders the closing of the Elder Café for two years. We reverse that part of the trial court's

---

43.  See *State ex rel. Pizza v. Rezcallah* at 121, 702 N.E.2d at 86.

44.  See *id.*

45.  See *id.* at 122, 702 N.E.2d at 87.

46.  See R.C. 3767.06(A).

47.  See *State ex rel. Pizza v. Rezcallah* at 124–125, 702 N.E.2d at 89.

judgment and remand this case for the dissolution of the padlocking order and the immediate return of the property to Grogan.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

GORMAN, P.J., and WINKLER, J., concur.

GORMAN, Presiding Judge, for the court on Grogan's Third Assignment.

### Counterclaim Concerning Tax Returns

Grogan challenges the summary judgment granted by the trial court in favor of the city on his counterclaim alleging that the city had disclosed his city tax returns with his attached federal income tax returns in violation of the confidentiality afforded by Section 6103, Title 26, U.S.Code. We disagree.

The city attached to its petition for the ex parte TRO Sergeant Hunt's affidavit, which states, "The tax documents on file with the City of Cincinnati Tax Department reflect Jerome Grogan's signature as President of Nate's Café." Also attached to Sergeant Hunt's affidavit were 1995 through 1997 city income-tax returns with corresponding federal income tax returns for those same years, filed in the name of Nate's Café, Inc., and signed by Grogan either as president or as the "tax matters person for the S corporation."

Grogan vaguely cast his counterclaim against the city in terms of a violation of his right of privacy. The pleading requirements and the merits of the privacy claim have not been addressed by either party. Nothing suggests that the release of Grogan's tax returns was prompted by a city policy, a predicate for a valid civil-rights claim under Section 1983, Title 42, U.S.Code. Furthermore, because of the public's legitimate concern about nuisance abatement, any intrusion into Grogan's privacy resulting from the exercise of the city's police power was not wrongful under the elements of an actionable claim for invasion of the common law right of privacy. See *Housh v. Peth* (1956), 165 Ohio St. 35, 59 O.O. 60, 133 N.E.2d 340, paragraphs one and two of the syllabus; see, also, *Strutner v. Dispatch Printing Co.* (1982), 2 Ohio App.3d 377, 2 OBR 435, 442 N.E.2d 129. And even if Grogan's claim was well-pleaded, a city employee, who negligently discloses confidential information acts in connection with a governmental function. Both the employee and the political subdivision are, as a matter of law, immune from liability for damages pursuant to R.C. 2744.02(A)(1). See *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 292, 595 N.E.2d 862, 869. To remand this issue to the trial court for further consideration would simply be an exercise in futility.

More important, however, is that disclosure of Grogan's tax returns was authorized under Section 6103(p)(8), Title 26, U.S.Code. Under the definition in Section 6103(b)(5)(B)(i), "The term 'State' means—for purposes of subsections * * * (p) any municipality—with a population in excess of 250,000 (as determined under the most recent decennial United States census data available) * * *." Section 6103(p)(8)(B) provides:

"Nothing in subparagraph (A) shall be construed to prohibit disclosure by an officer or employee of any State of any copy of any portion of a Federal return * * * which is required to be attached or included in a State return to another officer or employee of such State (or political subdivision of such State) *if such disclosure is specifically authorized by State law.*"  (Emphasis added.)

As Cincinnati, with a population in excess of 250,000, qualifies as a "state," the next inquiry is whether the city authorized disclosure of Grogan's federal tax returns by the city's Income Tax Bureau to police officers.  Cincinnati Municipal Code 311–61 states:

"Any information gained as a result of any returns, investigations hearings, or verifications required or authorized by this chapter shall be confidential and no disclosure thereof shall be made except to municipal, county, state or federal taxing agencies, or, *except for official purposes,* or except in accordance with proper judicial order.  No person shall otherwise divulge such information." (Emphasis added.)

The scope of the term "official business" is broader in Cincinnati Municipal Code 311–61 than in R.C. 718.07, which prohibits disclosure of federal tax returns "except in accordance with a proper judicial order or in connection with that person's official duties or the official business of the municipal corporation as authorized by this chapter or ordinance authorizing the levy."

The trial court determined that the attachment of Grogan's city and federal tax returns was proper as part of the city's official business and as reasonably necessary for its pleadings.  We agree that the attempt to abate a nuisance, like the Elder Café was within the exercise of the city's police power and related to the city's official business.  As the trial court appropriately found, ownership of the Elder Café was unclear from the deed.  The deed showed that the premises were owned by Nate's Café, Inc. Accordingly, for purposes of the *ex parte* TRO, Grogan's tax returns clarified ownership as well as Grogan's involvement as the corporate president.

There was no violation of confidentiality within the terms of Section 6103, Title 26, U.S.Code or Cincinnati Municipal Code 311–61, and, therefore, Grogan's third assignment of error is overruled.

WINKLER, J., concurs.

PAINTER, J., dissents.

PAINTER, Judge, dissenting on Grogan's Third Assignment.

Grogan challenges the trial court's entry of summary judgment in favor of the city on his claim that the city had violated R.C. Chapter 718, R.C. Chapter 5747, and Section 6103, Title 26, U.S.Code, by improperly disclosing his city tax returns and his attached federal tax returns. According to Grogan, the city was not entitled to use his tax returns as supporting documents when it filed its nuisance action. (While the city raised the issue of immunity in a filing captioned "Citation of Additional Authority" in support of its motion for summary judgment, the trial court did not address this issue, nor has the city asserted it in its appellate brief.)

In support of its summary-judgment motion on Grogan's counterclaim, the city filed an affidavit in which the audit supervisor of Cincinnati's Income Tax Bureau stated that he had released the tax records concerning Nate's Café to the city Prosecutor's office to be used by that office in its official capacity pursuant to Cincinnati Municipal Code 311–61 and R.C. 718.07. The affidavit further stated that the tax records were kept in the ordinary course of the city's business and were released only for use in connection with the city's official business.

The trial court determined that the attachment of Grogan's tax returns was proper as a part of the official business of the city and as a reasonably necessary part of its pleadings. The court found that an attempt to abate a nuisance was within the city's official business, and that the tax returns appropriately showed the ownership of the premises and the extent of activity on the premises. The majority decision of this court agrees with the trial court's conclusion. I do not.

The issue put before this court is whether the city violated R.C. Chapter 718, R.C. Chapter 5747, and Section 6103, Title 26, U.S.Code, by improperly disclosing Grogan's city and federal tax returns. The city has answered Grogan's appeal by claiming that Cincinnati Municipal Code 311–61 authorized the disclosure.

Generally, the information provided in tax returns is confidential.[48] That confidentiality, however, is not absolute. Under Section 6103, Title 26, U.S.Code, federal tax returns and the information in the returns are confidential unless one of the enumerated exceptions is applicable. Under the "Procedure and record-keeping" section of the federal statute regarding confidentiality, pertinent state-law requirements are set forth.[49] As a safeguard, Section 6103(p)(8)(A), Title 26, U.S.Code requires that no federal employee disclose federal tax returns or return

---

48. See R.C. 718.07.

49. See Section 6103(p)(8), Title 26, U.S.Code.

information "to any officer or employee of any State which requires a taxpayer to attach to, or include in, any State tax return a copy of any portion of his Federal return, or information reflected on such Federal return, unless such State adopts provisions of law which protect the confidentiality of the copy of the federal return (or portion thereof) attached to, or the federal return information reflected on, such State tax return." (Cincinnati is a "State" as defined by the federal statute.) Nothing in these provisions, however, "shall be construed to prohibit the disclosure by an officer or employee of any State of any copy of any portion of a Federal return or any information on a Federal return which is required to be attached or included in a State return to another officer or employee of such State (or political subdivision of such State) if such disclosure is specifically authorized by State law."

Under the applicable state law, disclosure of tax-return information is allowed "in accordance with a proper judicial order or in connection with the performance of [the disclosing] person's official duties or the official business of the municipal corporation as authorized by [R.C. Chapter 718] or the charter or ordinance authorizing the levy."

Cincinnati Municipal Code 311–61 states:

"Any information gained as a result of any returns, investigations, hearings or verifications required or authorized by this chapter shall be confidential and no disclosure thereof shall be made except to municipal, county, state or federal taxing agencies, or, except for official purposes, or except in accordance with proper judicial order. No person shall otherwise divulge such information."

I agree with the city that R.C. Chapter 5747 is inapplicable to the tax returns at issue to the extent that the chapter relates to state income-tax returns. State tax returns are not at issue here. In this case, it appears that Grogan released his federal income-tax returns to the city as allowed by the Cincinnati Municipal Code. Thus, the issue to be determined is whether the city violated Cincinnati Municipal Code 311–61 and R.C. 718.07 as they relate to the confidentiality requirements of Section 6103(p)(8)(B), Title 26, U.S.Code.

R.C. 718.07 limits disclosure of tax information except in connection "with the performance of [the divulging] person's official duties or the official business of the municipal corporation as authorized by [R.C. Chapter 718]" or as authorized by "the charter or ordinance authorizing the levy." R.C. Chapter 718 regulates the subject of municipal taxation, including the levy and collection of municipal income taxes.[50] Thus, the "official duties" or "official business" of the municipal corporation or its employees "as authorized under the statute" clearly limits the

---

50. See *Cincinnati Imaging Venture v. Cincinnati* (1996), 116 Ohio App.3d 1, 686 N.E.2d 528.

disclosure of tax information by the city to tax-related matters contained in R.C. Chapter 718.

The Cincinnati Municipal Code uses the phrase "official purposes" to describe when tax returns or tax information may be disclosed. That term is not defined. The phrase has been judicially defined, however, as it is used in R.C. 5747.18. R.C. Chapter 5747 directs that any undefined term used in R.C. Chapter 5747 "has the same meaning as when used in a comparable context in the Internal Revenue Code, and all other statutes of the United States relating to federal income taxes."[51] The Tenth District Court of Appeals has determined that "federal income tax returns are open to inspection solely by public officials lawfully charged with the administration of state laws, and only if the inspection is for the purpose of administering such laws."[52] Consequently, in that court's view, "any exception to the confidentiality principle of information included in income tax returns [can] be rationalized only when the requesting party's inspection is directly related to the administration of any state or local tax law."[53] Thus, tax returns should not be released to other public officials "unless it is affirmatively demonstrated that they must have access to them to perform legally delegated duties of administering or enforcing *tax laws* of the state of Ohio or a political subdivision thereof."[54] The fact that this definition of "official purpose" is consistent with the federal income-tax policy of confidentiality confirms its desirability, when Section 6103(p)(8)(A), Title 26, U.S.Code requires the Cincinnati Municipal Code to protect the confidentiality of federal returns.

To accept the city's argument that bringing a nuisance-abatement action is an "official purpose" allowing disclosure of confidential tax information would destroy any semblance of confidentiality. Under the city's interpretation of "official purpose," any city official could obtain tax records for any civil or criminal prosecution without regard to whether the prosecution related to tax matters. A court cannot presume that a legislative body "intended to enact a law producing unreasonable or absurd consequences."[55] The city's interpretation would abrogate the confidentiality accorded tax returns under both federal and local law.

---

**51.** See R.C. 5747.01.

**52.** See *Collins v. Ferguson* (1976), 48 Ohio App.2d 255, 261, 2 O.O.3d 222, 226, 357 N.E.2d 51, 55.

**53.** See *id.*

**54.** See *id.* (Emphasis added.)

**55.** See *State ex rel. Cooper v. Savord* (1950), 153 Ohio St. 367, 41 O.O. 396, 92 N.E.2d 390.

The remaining provisions of Cincinnati Municipal Code Chapter 311 support this conclusion. The chapter deals with the city's income tax and authorizes the tax commissioner to collect and receive taxes imposed by the chapter, to keep accurate records, and to enforce the provisions of the chapter.[56] The chapter also authorizes the tax commissioner, or any authorized agent of the tax commissioner, to examine federal income-tax returns to verify accuracy.

Cincinnati Municipal Code 311–69 creates a board of review consisting of the city manager or his representative, a designated city official, and the director of finance to conduct private hearings on decisions by the tax commissioner. That same section states that "[t]he provisions of Section 311–61 hereof with reference to the confidential character of information required to be disclosed by this chapter shall apply to such matters as may be heard before the board of appeal." It seems obvious that the "official purpose" referred to in Cincinnati Municipal Code 311–61 pertains to the duties and responsibilities of the tax commissioner, his agents, and the board of review relating to the investigation and administration of local taxes.

This interpretation is supported by decisions of courts in other jurisdictions regarding their state laws requiring public officials to maintain the confidentiality of income-tax returns.[57] State statutes that make tax-return information confidential by "prohibiting tax or other governmental officials from divulging information contained in income tax returns [have] been not only to protect the individual taxpayer's privacy or his privilege against self-incrimination, but also to facilitate tax enforcement by encouraging the taxpayer to make full and truthful declarations in his returns, without fear that his statements will be revealed or used against him for other purposes."[58] Similarly, Section 6103, Title 26, U.S.Code was enacted to "protect taxpayers' reasonable expectations of privacy" and "to ensure maximal compliance with the Federal tax laws."[59]

Further, I would conclude that Cincinnati Municipal Code 311–61's use of "for official purposes" does not specifically authorize the release of tax information as provided in Section 6103(p)(8)(B), Title 26, U.S.Code. Obviously, if the drafters of the municipal code had wanted specific exemptions to the confidentiality section concerning taxation, the drafters could have included such specific authorization. To hold that the term "for official purposes" is so broad as to specifically

56. See Cincinnati Municipal Code 311–53.

57. See Annotation, Validity, Construction, and Effect of State Laws Requiring Public Officials to Protect Confidentiality of Income Tax Returns or Information (1980), 1 A.L.R.4th 959.

58. See *id.* at 963.

59. See *Commonwealth v. Burgess* (1997), 426 Mass. 206, 208, 226, 688 N.E.2d 439, 442, 452.

authorize an exemption to confidentiality for proceedings unrelated to tax issues would allow the exemption to swallow the general provision for confidentiality.

The city also asserts that Grogan provided tax returns as a result of discovery requests. The record does not clearly demonstrate this. (Although some reference was made to tax returns in Grogan's deposition, it is not clear exactly what was being discussed, and Grogan's counsel did object to the production of "personal tax returns.") If the record had sufficiently demonstrated that the tax returns at issue had been produced in discovery or that the city had sought the tax records under a proper judicial order, it might have affected my determination to sustain Grogan's assignment. But, based on the record, I would conclude that the trial court erred in granting summary judgment to the city on Grogan's counterclaim asserting improper disclosure. The parties did not raise, and the trial court did not address, what remedy, if any, a violation of this section would occasion. I would leave that issue to be resolved by the trial court. Thus, I would sustain Grogan's third assignment as it relates to this claim and remand this case to the trial court for further consideration.