[Cite as *State ex rel. Waldick v. Howard*, 2012-Ohio-404.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

**STATE OF OHIO, EX REL.,**
**ALLEN COUNTY PROSECUTOR**
**JUERGEN A. WALDICK,**

        **CASE NO. 1-11-33**

    **PLAINTIFF-APPELLANT,**

    **v.**

**MOSE HOWARD, ET AL.,**        **O P I N I O N**

    **DEFENDANTS-APPELLEES.**

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CV2009 0809**

**Judgment Affirmed**

**Date of Decision: February 6, 2012**

**APPEARANCES:**

    *Gregory M. Antalis* **for Appellant**

    *John A. Poppe* **for Appellees**

Case No. 1-11-33

**PRESTON, J.**

{¶1} Plaintiff-appellant, State of Ohio ex rel. Allen County Prosecutor Juergen A. Waldick (hereinafter "the State"), appeals the Allen County Court of Common Pleas' judgment entry enjoining the defendants-appellees, Moses and Willa Pearl Howard (hereinafter "the Howards"), from maintaining a nuisance at their place of business, the EZ Check Market (hereinafter "the market"), under R.C. 3767.05(D) but denying the State's request for an abatement order closing the market for one year. For the reasons that follow, we affirm.

{¶2} On May 6, 2004, the Howards' grandson, Dwaynel Howard, Jr., was arrested for selling crack cocaine to an undercover officer from a vehicle parked directly outside the front door of the market. (Apr. 11, 2011 Tr. Vol. II at 8, 17);[1] (Godfrey Aff., Doc. No. 56, attached).[2] Dwaynel was subsequently convicted of trafficking in crack cocaine in Allen County Case No. CR2004 0233. (7/28/04 JE & 9/8/04 JE, Doc. No. 56, attached).

---

[1] The bench trial was held on one day: April 11, 2011. All references to the transcript herein refer to the bench trial held on that one day, so the date will be excluded from the citation hereinafter.

[2] Since the trial court had already granted the State partial summary judgment determining that the EZ Check Market was a nuisance as a matter of law, the bench trial was limited to the issue of whether the Howards acquiesced to the perpetuation of the nuisance. Therefore, it was necessary to take some of the facts stated herein from affidavits and notarized court documents submitted in support of the State's motion for summary judgment. (Doc. No. 56). It should be noted that these documents were made part of the record, not contested by the Howards in their memorandum contra the State's motion for partial summary judgment, and formed the factual basis of the trial court's grant of summary judgment. (11/12/10 JE, Doc. No. 60). Furthermore, the Howards acknowledged that many of these events occurred throughout the proceedings but alleged that they were not to blame for the incidents; law enforcement responded inadequately to the drug trafficking problem; and, law enforcement contributed to the drug trafficking problem by using C.I.s and "secret police" to sell drugs near their market. (See Answer and Amended Answer, Doc. Nos. 8, 29).

**{¶3}** On November 5th and 17th, 2004, a confidential informant ("C.I.") purchased crack cocaine from Bart Howard, who was standing directly outside the back door of the market. (Johnson Aff., Doc. No. 56, attached). On December 8, 2004, a C.I. purchased crack cocaine from Bart again. (*Id*.). During this second drug purchase, Bart brought the crack cocaine from inside the market to the outside back door to complete the sale. (*Id*.). Bart was subsequently convicted of trafficking in crack cocaine in Allen County Case No. CR2005 0009. (8/23/05 JE & 9/26/05 JE, Doc. No. 56, attached).

**{¶4}** On or about September 15, 2005, a Lima police officer, while on a routine patrol of the area, observed David Evans standing in front of the market. (Stechschulte Aff., Doc. No. 56, attached). The officer knew Evans had an active warrant, so he parked in front of the market at which time Evans walked into the market behind the counter. (*Id*.). The officer then entered the market and placed Evans into custody, and a search incident to arrest revealed five crack cocaine rocks upon his person. (*Id*.). During a later police interview, Evans admitted that he went into the market to avoid being arrested for his outstanding warrant. (*Id*.). Evans was later convicted of possession of crack cocaine in Allen County Case No. CR2005 0441. (*Id*.); (12/19/05 JE & 2/22/06 JE, Doc. No. 56, attached).

**{¶5}** On or about October 5, 2006, members of the Lima Police Department conducted an undercover operation targeting street-level drug sales near the

market. (Delong Aff., Doc. No. 56, attached). A black male, later identified as Ivory Kendricks, approached an undercover officer's vehicle, and the officer asked to purchase crack cocaine. (*Id.*). In response, Kendricks stated, "[y]eah, I gotta go in the store." (*Id.*). Kendricks entered the market, exited a short time later, and handed the undercover officer drugs. (*Id.*). Kendricks was subsequently convicted of trafficking crack cocaine in Allen County Case No. CR2006 0475. (*Id.*); (1/9/07 JE & 2/23/07 JE, Doc. No. 56, attached).

{¶6} On or about June 11, 2007, the Lima Police Department P.A.C.E. unit conducted a controlled drug buy from the Howard's son, Randell, who was in a vehicle parked directly outside the back door of the market. (Tr. Vol. I at 15); (Tr. Vol. II at 6); (Godfrey Aff., Doc. No. 56, attached). On June 18, 2007, a C.I. made an additional controlled drug purchase from Randell while Randell was behind the counter in the market. (Godfrey & Johnson Affs., Doc. No. 56, attached).

{¶7} On or about June 19, 2007, law enforcement served a search warrant at the market. (Tr. Vol. I at 16); (Tr. Vol. III at 7); (Miller Aff., Doc. No. 56, attached). During the search, law enforcement located a piece of crack cocaine behind the front counter of the market; a clear plastic baggie of marijuana on the floor behind the counter of the market; a razor blade with residue on it behind the counter of the market; a brown paper bag with residue behind the counter of the

market; 1.5 grams of crack cocaine and a second baggie of marijuana on the floor of the market. (Tr. Vol. III at 8-9); (Miller Aff., Doc. No. 56, attached). Dwaynel Howard was later convicted for possession of crack cocaine in Allen County Case No. CR2007 0368 (5/15/07 JE & 4/15/08 JE, Doc. No. 56, attached); Randell Howard was later convicted of trafficking in crack cocaine in Allen County Case No. CR2008 0180 (8/12/08 JE & 9/18/08 JE, Doc. No. 56, attached).

{¶8} On June 26, 2007, the Lima Police Department sent a letter to the Howards advising them of the illegal drug activity at their market. (P's Ex. 2); (Tr. Vol. II at 38-39). The Howards were further advised that their market constituted a public nuisance and that legal proceedings would be commenced if they failed to take action to abate the nuisance. (*Id.*); (*Id.*).

{¶9} On November 10th, 12th, and 17th, 2008, the West Central Ohio Crime Task Force conducted controlled drug purchases from Dwaynel Howard, Sr. inside the residential side of the market (1123 St. Johns). (Tr. Vol. I at 54-55, 57-58, 72); (Tr. Vol. III at 9); (Inv. Howard Aff., Doc. No. 56, attached). On November 20, 2008, a search warrant was served at the market, and law enforcement found drug paraphernalia, such as digital scales and baggies, in the residential side of the market. (Tr. Vol. I at 55, 60, 61, 80); (Inv. Howard Aff., Doc. No. 56, attached). In the basement shared between 1123 and 1125 St. Johns, law enforcement found a cookie tin containing baggies with white residue on

them, a dinner plate with a razor blade on it containing white residue, and several firearms. (Tr. Vol. I at 61-62); (Inv. Howard Aff., Doc. No. 56, attached).

{¶10} On or about December 2, 2008, the Allen County Sheriff's Office sent a letter to the Howards advising them of the illegal drug activity at their market. (P's Ex. 3); (Tr. Vol. II at 38-39).  The Howards were again notified that their market constituted a nuisance subject to abatement under Ohio Revised Code Chapter 3767. (*Id*.); (*Id*.).

{¶11} On April 10, 2009, a C.I. went to the east side of the market and purchased $20.00 worth of crack cocaine from a window located under an overhang on the back porch of the market. (Tr. Vol. I at 14-15).

{¶12} On June 18, 2009, the Lima Police Department and the West Central Ohio Crime Task Force conducted a controlled drug buy using an undercover officer. (Leary Aff., Doc. No. 56, attached).  The undercover officer drove in the area of the market and asked to purchase crack cocaine from a black male, later identified as Curtis Dunlap. (*Id*.).  Dunlap was observed to walk into the market and emerge a short time later with drugs. (*Id*.).  Dunlap was subsequently convicted of trafficking in cocaine in Allen County Case No. CR2010 0065. (3/3/10 JE & 4/12/10 JE, Doc. No. 56, attached).

{¶13} On August 10, 2009, the State filed a complaint for nuisance abatement and request for injunctive relief alleging the aforementioned criminal activity at the Howards' market. (Doc. No. 1).

{¶14} On September 25, 2009 and with leave of court, the Howards filed a document entitled "Answer of Moses and Willa Howard and Counterclaim and Cross-Claim with Jury Demand Endorsed Hereon"[3] against the State, the Lima Police Department, Lima Police Department S.W.A.T., Lima Police Department P.A.C.E., Lima Police Department B.C.I. & I., West Central Ohio Crime Task Force ("WCOCTF"), and John Does 1-16 (undercover officers involved in the controlled drug buys at the market). (Doc. Nos. 6-8).

{¶15} On October 22, 2009, a stipulated extension was entered for the State and the WCOCTF to move or otherwise plead to the Howards' counter-claim and third-party complaint by November 13, 2009. (Doc. No. 16).

{¶16} On October 26, 2009, the Lima Police Department, P.A.C.E., S.W.A.T., and B.C.I. & I. filed a joint motion to dismiss pursuant to Civ.R. 12(B)(1) and Civ.R. 12(B)(6). (Doc. No. 17). On November 4, 2009, the Howards filed a memorandum contra the motion to dismiss; however, the trial court granted the motion to dismiss on November 6, 2009. (Doc. Nos. 18-19).

---

[3] The claims against the Lima Police Department, the other law enforcement agencies or units, and John Does 1-16 technically constitute a third-party complaint under Civ.R. 14, not "cross-claims" under Civ.R. 13, as designated.

{¶17} On December 15, 2009, the Howards filed a motion for leave to amend their answer and counter claim to join the City of Lima as a third-party defendant. (Doc. No. 27). The trial court granted the Howards leave to amend, and on February 8, 2010, the City of Lima filed a motion to dismiss pursuant to Civ.R. 12(B)(2), (5), and (6). (Doc. No. 43). On February 19, 2010, the State and the West Central Ohio Crime Task Force filed a motion to dismiss the Howards' counterclaims and third-party complaints and/or sever the claims for purposes of trial. (Doc. No. 44).

{¶18} The trial court dismissed the City of Lima on March 16, 2010. (Doc. No. 51). The trial court dismissed the Howards' claims against the State and WCOCTF on March 24, 2010. (Doc. No. 53).

{¶19} On October 1, 2010, the State filed a motion for partial summary judgment on the issue of whether or not the Howards' market was a nuisance under Ohio Revised Code Chapter 3767. (Doc. No. 56). On October 15, 2010, the Howards filed a memorandum contra the State's motion for partial summary judgment. (Doc. No. 57). However, on November 12, 2010, the trial court granted the motion for partial summary judgment declaring that a nuisance exists and has been maintained at the market. (Doc. No. 60). The trial court certified the judgment entry as a final, appealable order pursuant to Civ.R. 54(B). (*Id.*). The

Howards filed an appeal, but we dismissed it for lack of jurisdiction. (Doc. Nos. 62, 65).

{¶20} On April 22, 2011, the matter proceeded to a bench trial with the sole issue of whether or not the Howards knowingly acquiesced in the creation or perpetuation of the nuisance at their market for purposes of issuing an abatement order under R.C. 3767.05(E) and 3767.06(A). (Doc. Nos. 67, 88, 93).

{¶21} On May 11, 2011, the trial court issued its decision and judgment entry declaring the Howards' market a nuisance but denying the abatement order, and finding that the State failed to present clear and convincing evidence that the Howards were culpable in the creation or perpetuation of the nuisance activities. (Doc. No. 93).

{¶22} On June 8, 2011, the State filed a notice of appeal. (Doc. No. 95). The State now appeals raising one assignment of error for our review.

### ASSIGNMENT OF ERROR

**THE TRIAL COURT'S MAY 11, 2011, DECISION AND JUDGMENT ENTRY THAT APPELLANT FAILED TO PROVE, BY CLEAR AND CONVINCING EVIDENCE, THAT THE APPELLEES ACQUIESCED TO THE NUISANCE ACTIVITIES AT THE SUBJECT PREMISES, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶23} In its sole assignment of error, the State argues that the trial court's denial of the abatement order was against the manifest weight of the evidence.

Specifically, the State argues that the trial court expressly found as a legal conclusion, and the parties and witnesses all admitted, that the area near the market had a reputation for chronic drug activity; and therefore, the trial court had prima facie evidence of the Howards' acquiescence to the nuisance activity under R.C. 3767.05(A). The State argues that this prima facie evidence, along with the Howards' testimony at trial, amounted to clear and convincing evidence of the Howards' acquiescence as a matter of law.

{¶24} In civil cases, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Cincinnati ex rel. Cosgrove v. Grogan*, 141 Ohio App.3d 733, 749, 753 N.E.2d 256 (1st Dist. 2001), citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), paragraph one of the syllabus. Furthermore, an appellate court must presume that the trial court's findings of fact are correct because "the trial [court] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.*, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court." *Seasons Coal*, 10 Ohio St.3d at 80.

**{¶25}** "[I]n order to obtain an abatement order pursuant to R.C. 3719.10 and 3767.02 *et seq.*, it is necessary for the relator to prove by clear and convincing evidence that the defendant had knowledge of and either acquiesced to or participated in a felony violation of R.C. Chapter 2925 or 3719 on the property." *State ex rel. Freeman v. Pierce*, 61 Ohio App.3d 663, 671, 573 N.E.2d 747 (2nd Dist. 1991). *See also Grogan*, 141 Ohio App.3d at 748; *State ex rel. Pizza v. Rezcallah*, 84 Ohio St.3d 116, 702 N.E.2d 81 (1998), paragraph two of the syllabus. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). The relator may meet his burden of proving knowledge of and acquiescence to *or* participation in any one of three ways: first, by direct evidence; second, by proof of the property's general reputation; and third, by an admission by or a finding of guilt of any person under the criminal laws against [drug possession and drug trafficking] at the site of the alleged nuisance. *State ex rel. Pizza v. Carter*, 63 Ohio Misc.2d 235, 240, 622 N.E.2d 1194 (C.P. 1993); *Grogan*, 141 Ohio App.3d at 748-749. The second and third categories of evidence create a rebuttable presumption of knowledge and acquiescence or participation under R.C. 3767.05. *Carter*, 63 Ohio Misc.2d at 240; *Grogan*, 141 Ohio App.3d at 748-749.

{¶26} The State presented the testimony of six witnesses at trial. Lima Police Department Patrolman Timothy R. Goedde testified that the EZ Check Market was a small convenience store that sold alcohol, pop, and tobacco products and was "known for a high drug activity area. There's a lot of open air sales and a lot of people standing around." (Tr. Vol. I at 3-5). Goedde testified that, after he was assigned to the P.A.C.E. unit, he used to do controlled drug buys in and around the area of the EZ Check Market. (*Id*. at 7). He testified that, on June 11, 2007 during a controlled purchase, he observed a C.I. enter the front door of the EZ Check Market. (*Id*. at 11). Goedde testified that, on April 10, 2009 during a controlled purchase, he observed a C.I. approach an eastside window of the building attached to the EZ Check Market, stay there for a short period of time, and then leave in an eastbound direction. (*Id*. at 14-15). Goedde testified that narcotics were purchased during both controlled drug buys. (*Id*. at 15). Goedde further testified that, on June 9, 2009 during a controlled buy, he observed an undercover officer drive up to the EZ Check Market and gesture out of the car window that she wanted twenty dollars' worth of crack cocaine. (*Id*.). The undercover officer then drove around the block, and the person she asked to purchase the crack cocaine entered the front door of the EZ Check Mart long enough for the undercover officer to drive around the block a few times, and then park on Catalpa Street, according to Goedde. (*Id*. at 16). Goedde testified that

drugs were obtained during that controlled buy. (*Id*. at 15). Goedde further testified that he was involved in a raid of the EZ Check Market in June of 2007, and that the Howards were present during the raid. (*Id*. at 16). Goedde testified that he spoke with Mr. Howard at length about how he could deal with the drug problem around his business, suggesting criminal trespass laws as the main enforcement vehicle. (*Id*. at 17). Goedde testified that he did not ever have any conversation with Mr. Howard after that, and the Howards never called him afterwards to request his assistance with the criminal trespass forms. (*Id*. at 17-18).

{¶27} On cross-examination, Goedde testified that the undercover officers did not pay extravagant prices for drugs because that would create a red flag, though he acknowledged that undercover officers, who are white, could receive less crack cocaine for their twenty dollars because of their race. (*Id*. at 33). When asked if the Howards had ever called the police and the police failed to show up, Goedde testified, "I'd say they didn't call. We always show up[.]" (*Id*. at 35). Goedde testified that the Howards did not operate their business for the purpose of committing drug violations, but "they allow[ed] their establishment to be used for that." (*Id*. at 37). Goedde testified that the EZ Check Market closes at 9:00 p.m. but it used to stay open later. (*Id*. at 38).

{¶28} Investigator Danny Howard, an Allen County Deputy Sheriff assigned to the West Central Ohio Crime Task Force, testified that the EZ Check

-13-

Market had a reputation "as a hot bed for illegal activity, including drug trafficking." (*Id*. at 52-53). Investigator Howard testified that, on November 10, 2008, he witnessed a C.I. enter the front door of 1123 St. Johns, which is the residential side of the EZ Check Market. (*Id*. at 55). After leaving the premises, the C.I. indicated that he had just purchased crack cocaine from Dwaynel Howard, Sr. (*Id*.). Investigator Howard further testified that, on November 12th and 17th of 2008, the C.I. purchased more crack cocaine from Dwaynel Howard, Sr. at the same location. (*Id*. at 58). Investigator Howard testified that 1123 St. Johns is not listed as a separate property on the Allen County Auditor's website; rather, the only property listed is 1125 St. Johns, which is the business side of the property. (*Id*. at 55, 59). He further testified that basements for the buildings at 1123 and 1125 St. Johns are shared. (*Id*. at 60). Since the property was only listed as 1125 St. Johns and the properties shared a basement, law enforcement executed a search of both locations. (*Id*.). Investigator Howard testified that, in the residential side, they found drug paraphernalia such as digital scales and baggies, and, inside the shared basement, they found a cookie tin with baggies containing white residue, a dinner plate with a razor blade with white residue on it, and several firearms. (*Id*. at 61-62). At the time of the search, the Howards were behind the counter on the business side of the premises (1125 St. Johns). (*Id*. at 61, 69).

{¶29} On cross-examination, Investigator Howard testified that the three controlled drug buys occurred in the residential side of the premises where Dwaynel Howard, Sr. lived. (*Id*. at 63). When asked whether anyone had mentioned the Howards as being part of the drug problem, Investigator Howard testified, "Willa and Moses Howards' name has always been synonymous with the business of Howards' EZ Check. Their offspring has been -- well, it's been common in the law enforcement community to understand that they all sling dope from someplace around the residence, or the business, or on the street corner." (*Id*. at 71). He further testified that he had no personal knowledge that the Howards were involved in drug trafficking. (*Id*. at 72). Investigator Howard testified that Dwaynel Howard, Sr. was not at the residence during the search but denied knowing whether or not Dwaynel had been evicted. (*Id*. at 72-73). On the other hand, he testified that he had just seen Dwaynel "standing on the corner just a few days ago out in front of the business." (*Id*. at 73).

{¶30} Allen County Sheriff's Department Lieutenant Matthew Treglia, assigned to the West Central Ohio Crime Task Force, testified that the EZ Check Market is "a place where people hang out on the corner and sell drugs." (*Id*. at 74-76). Treglia testified that he had arrested several warrant suspects who were standing on the corner near the EZ Check Market. (*Id*. at 77). He testified that he had witnessed several drug transactions occur at the EZ Check Market where "a

car would pull up to the corner and people would have a brief conversation with the * * * persons in the vehicle. They would either leave right from there or people would go inside the EZ Check and come back out and then they would leave." (*Id*. at 79). Treglia also testified that they had arrested people with drugs on them in that area, and some of the vehicles in the area were from out-of-county, which was indicative of drug behavior. (*Id*.). On cross-examination, Treglia denied having knowledge of the Howards' frequent calls to the police department. (*Id*. at 92).

{¶31} The State then called Willa Howard upon cross-examination. (Tr. Vol. II at 1). Willa testified that she and her husband, Moses, have owned the EZ Check Market at 1123-1125 St. John's since 1997. (*Id*. at 2); (P's Ex. 1). Willa also testified that there is an apartment at 1123 St. John's. (Tr. Vol. I at 2). Willa testified that they used to live at 1115 St. Johns Avenue, which is two doors north from the market, but they now live at 1412 Hughes Avenue. (*Id*. at 3). Willa testified that the EZ Check Market was used as a convenience store and was their "job." (*Id*. at 3-4). Willa testified that they sold groceries, candy, cigarettes, beer, wine, fresh bread, eggs, packets of lunch meat, cookies, sugar, and flour at the market. (*Id*. at 4-5). She testified that she and her husband are at the business almost all the time since they work there, but she denied that other male adults come to the store to play cards. (*Id*. at 5). Willa testified that her son, Randell

Howard, used to be the market's night manager, and that he allowed things to go on at the market that should not have happened. (*Id*. at 5). Randell Howard went to prison in 2007 for selling drugs to an undercover officer in the EZ Check Market, according to Willa. (*Id*. at 5-6). Willa denied ever knowing that Randell was selling drugs at the market, though she recalled overhearing a police officer tell Randell that he heard about stuff going on at the store. (*Id*. at 6). Willa testified that she thought Randell was "set up," "but if he was stupid enough to be set up to sell drugs on the property then he's where he should be." (*Id*.). Willa admitted that there is drug activity around the area of the market, but it was not just near there but "the whole south end of Lima." (*Id*. at 7). When asked about the area right outside of the EZ Check Market, Willa testified, "[y]ea. I mean there was some drugs out there." (*Id*. at 8). Willa testified that she knew there were drugs out in front of the market because her grandson, Dwaynel Howard, Jr., was arrested outside of the market on a drug charge, and "[m]ost of the people that area, well, most of them sell drugs." (*Id*.). Willa acknowledged that people she suspected were dealing drugs in front of the market would run into the store when a police car drove by the market. (*Id*. at 9). Willa testified that she would tell those individuals not to run into the market, and she always tried to run people off her property. (*Id*.).

{¶32} Willa testified that the police were always welcome to come into her store, though she acknowledged she did not let the police feel welcome on one particular occasion when she felt the officers were being disrespectful to her. (*Id*. at 9-10). Willa testified that they never received the support they needed from the Lima Police Department, and that they were arrogant and disrespectful when they came to her market. (*Id*. at 10-11). Willa testified that they called the police for help, but the police said they could not respond every time she called, and they could not ask the drug dealers to leave since it was a public sidewalk. (*Id*. at 11). Willa estimated that she called the police department at least fifty times from 2004 to 2009, each time identifying herself as the caller and identifying the location as the EZ Check Market. (*Id*. at 12-13). Willa testified that she thought the undercover officers paid excessive amounts for drugs, because she overheard young people she knew talking about taking advantage of white people who were buying drugs in the neighborhood. (*Id*. at 14-15). Willa testified that she did not know there was a drug problem around the EZ Check until her grandson was arrested on a drug offense in 2004 outside of the market. (*Id*. at 17). Willa denied seeing any drug transactions occur outside of the market, but testified that she knew that drug dealers were hanging around trying to sell whatever they could. (*Id*. at 18).

**{¶33}** When asked about what she would do when known drug dealers would enter the EZ Check, Willa testified as follows:

> **A: Well, being like almost my kids, you know, kids that I have known all my life, they didn't sell drugs in the store. The majority of the people in that neighborhood I think sell drugs – sell them or use them. So, what, because somebody sells drugs you don't let them in your store?**
> **Q: Yea. Yea.**
> **A: Well, if that was the case we really wouldn't have no business. Okay?**
> **Q: So, your testimony is that you're really not going to have any business unless you let drug dealers in your store?**
> **A: Well, are you supposed to turn them away if you know they sell drugs? Are you? * * * As long as it's not inside my store, I mean, what they do is their business.**

(*Id.* at 20). Willa testified that she never attempted to photograph any of the people hanging outside of her market to give those photographs to the police. (*Id.* at 20-21). She testified that, in 2010, she posted a "no loitering" sign on the door of the market, which lasted about a year until "it got ripped up." (*Id.* at 21-22). She also testified that they had security cameras inside the EZ Check but not outside of the market, though the security cameras were not working from 2004 to 2009. (*Id.* at 22). The Howards never considered hiring a security guard for the business because they were the security according to Willa. (*Id.* at 25). She also testified that, prior to 2007, her son, Randell Howard, would work in the EZ Check from 7:00 p.m. to 12:00 midnight, but, after 2007, they closed the EZ Check at 9:00 p.m. (*Id.* at 26). Randall has not worked at the market since his

arrest according to Willa. (*Id*. at 26-27). Willa testified that she had seen open air drug deals in front of the store while she had police officers inside the store watching. (*Id*. at 31). Willa testified that the drugs found in the EZ Check Market during the drug raid were dropped in the store by customers. (*Id*. at 35.). Willa testified that she recalled a police officer discussing signing a document to give law enforcement the power to remove persons outside the market, but she did not recall signing it. (*Id*. at 36-37).

{¶34} Willa admitted that she received letters from the Lima Police Department and the Sheriff's Office. (*Id*. at 38-39). She further testified that, after discovering that her son, Randell, was involved in drugs after the search of the EZ Check Market, her husband and she fired him and evicted him from the attached apartment. (*Id*. at 39). Later, after the second letter in December 2008, they evicted another son, Dwaynel, from the attached apartment. (*Id*. at 41). Willa testified that both of her sons, Randell and Dwaynel, had "apparently" sold drugs from the apartment, though she denied knowing about them selling drugs. (*Id*.). Willa admitted that, from 2004 to 2009, the EZ Check Market had a reputation as a place one could obtain drugs. (*Id*. at 42-43). She testified that, about three weeks ago, people were hanging out in front of her store so she told them to leave the area, but they only went to the other side of the road. (*Id*. at 47). Willa further

testified that she talked to Lima Police Chief Garlock about the incident, but no officer responded. (*Id*. at 48).

**{¶35}** Moses Howard testified upon cross-examination that the neighborhood around the EZ Check Market had a reputation for being an area to obtain drugs, and, in fact, that is why the previous owner sold the business. (*Id*. at 53-54). Moses further testified: "1998, when we bought the property, it seemed that the drug problem just escalated and just grew and it just grew because, well, I have heard individuals say that it was a good place to sell drugs because they wasn't getting arrested there." (*Id*. at 57). Moses testified that he saw drug deals occur outside the market, but he further testified that he called the police department to complain many times. (*Id*. at 58-59). He testified that they "always" saw cars drive up and things get exchanged. (*Id*. at 60). Moses testified that they sold merchandise to people that broke the law, including people that he had seen making a drug deal immediately before entering the market. (*Id*. at 61-62). Moses testified that the drug dealers used the EZ Check Market as "cover" when the police drove by. (*Id*. at 64). Moses also testified that he believed the Lima Police Department did not do enough to stop the drug problems around the market. (*Id*. at 68-70). According to Moses, the apartment connected to the EZ Check was a source of the drug problem, and two of his children were part of the problem. (*Id*. at 74-75). Moses testified that they purchased the video cameras for the market to

monitor thefts in the store, but that the system was only operational for about three to four years, from about 1998 to 2002. (*Id*. at 76). He testified that, about a year ago, they placed "no soliciting" signs on the front door of the market. (*Id*. at 77). Moses testified that they did not consider hiring a security guard but kept calling the police, instead. (*Id*. at 77-78). Moses testified that he did not recall the police asking him to sign a power of attorney, and he wished they would have because he would have signed it. (*Id*. at 78).

{¶36} Christopher Neal Protsman, a Lima Police Department Lieutenant and member of the P.A.C.E. unit, testified that he has never seen any bread, eggs, lunch meat, fresh vegetables or fruit being sold at the EZ Check Market. (Tr. Vol. III at 3-4). He testified that the EZ Check Market had a reputation for being an area for drug trafficking. (*Id*. at 4). Protsman testified that, in 2007, he saw a vehicle stopped outside of the EZ Check Market with a gentleman standing at the window of the vehicle, indicative of an open-air drug sale. (*Id*.). He testified that he subsequently arrested the driver of the vehicle for possession of crack cocaine. (*Id*. at 5). The driver, who was from Celina, told Protsman that he learned at a party if he wanted to buy crack cocaine there would be people standing in front of the EZ Check Market who would sell to him. (*Id*.). Protsman testified that he was involved in the June 2007 search of the EZ Check Market, and that the Howards were "very irate" that law enforcement were inside the market. (*Id*. at 7-8).

Protsman testified that they found crack cocaine on the floor and counter of the market and a razor blade with cocaine residue under the counter of the market during the search. (*Id.* at 8-9). Protsman further testified that he talked with Willa about executing a power of attorney for the police department to remove people off their property through criminal trespass. (*Id.* at 12). Protsman testified that he was only aware of the Howards calling the police to report drug activity on one occasion. (*Id.* at 14). Protsman testified that Willa filed a formal complaint against two police officers who entered the market in October 2005. (*Id.* at 14-15). Protsman testified that, as a result of the complaint, he investigated the incident. (*Id.* at 15). Protsman testified about that investigation as follows:

> **she let me know that the officers -- two officers came into the business and just started walking around, didn't acknowledge her or didn't say anything to her. When she went up to ask them why they were there, they became upset with her and she thought she was being disrespected by them.**
>
> **I talked to the officers about this incident and also reviewed their video tapes, which was just the audio of what was going on. The officers pulled up into the area and two gentleman, when they saw the officers ran behind the business. The officers thought that maybe they were going in the back door so the officers walked inside to see if they could locate those individuals.**
>
> **Once they got inside, Mrs. Howard did approach them and asked them what they were doing inside the store. When they didn't answer uh, she told them that she didn't appreciate them walking into her business. And then her son who was behind the**

-23-

**counter, Randell, also told them that they were not wanted inside the business.**

(*Id*. at 15-16). On cross-examination, Protsman testified that the Howards failed to do everything they could have to eliminate the drug problem at their market. (*Id*. at 25).

{¶37} Thereafter, the defense presented the testimony of Moses Howard. Moses testified that he originally bought the EZ Check Market so he could pass it on to his family. (*Id*. at 44). He testified that he is an ordained minister, and he works as an assistant pastor at the New Greater Grace Missionary Baptist Church. (*Id*. at 45). Moses attributed the drug problems in the neighborhood to a lack of police enforcement due to budgetary constraints. (*Id*. at 47). Moses testified that they stopped renting out the apartment next door to the EZ Check Market, which he thought helped solve some of the drug problems. (*Id*. at 48). He further testified that they also closed the market earlier and began running it on their own to reduce the drug activity. (*Id*. at 50).

{¶38} Willa Howard testified that they bought the EZ Check Market after learning from the previous owner that he was considering selling it to "Indians or Arabs" and they "didn't want to live in front of a business that the Arabs or the Indians owned." (*Id*. at 54-55). She testified that she was not aware that Randell was selling drugs until after the 2007 search. (*Id*. at 57). Willa testified that she

would not have thought anything strange about seeing razor blades and baggies near the market counter since they use razor blades to open boxes and plastic baggies to sell penny candy. (*Id*. at 57). Willa testified that she thought they solved the drug problem when Randell was arrested, and they evicted him from the apartment. (*Id*. at 58). Willa testified that Protsman brought out power of attorney forms for her to sign, but she did not sign them because they had to be notarized, and she did not know the last names of the individuals she wanted off the property, which was necessary for the form. (*Id*. at 61). Willa testified that things have improved near the EZ Check Market since they were served with the nuisance complaint because she told the suspected drug dealers to stop since they were in court because of them. (*Id*. at 63). Willa testified that Moses and she are planning on moving into the apartment attached to the market to be better stewards of their property. (*Id*. at 64). She testified that they also started closing the market at 9:00 p.m. to deter drug activity in the area. (*Id*. at 66). Willa also testified that she and her husband have always considered the store as an outreach from their church. (*Id*. at 68).

{¶39} After reviewing the evidence presented at trial, we cannot conclude that the trial court's judgment denying the abatement order was against the manifest weight of the evidence since there was competent, credible evidence demonstrating that the Howards did not acquiesce in perpetuation of the nuisance

at their market.  The Howards testified that, once they discovered that their sons, Dwaynel and Randell, were selling drugs from the apartment (1123 St. Johns) attached to the market (1125 St. Johns), they evicted them.  They also terminated Randell's employment at the market.  They further testified that they began to work at the market all day themselves (10:00 a.m. to 9:00 p.m.) rather than have employees, so they could manage the property better.  The Howards testified that Randell used to work at the market until 12:00 midnight, but they decided to close the market earlier to diminish the drug activity around the market.  The Howards also testified that they worked with law enforcement, calling the police over fifty times, in an effort to curb the drug activity near their market.  The Howards even put up a "no loitering" sign on their business after the nuisance complaint was filed, and Willa testified that she told the drug dealers to leave the area on multiple occasions.  Finally, the Howards testified that they were going to move into the apartment attached to their market so they could be better stewards of their property in the future.  Based upon the aforementioned testimony, the trial court's judgment was not against the manifest weight of the evidence.

{¶40} Despite the foregoing evidence, the State argues that, after examining the evidence presented, the trial court's factual findings, and the Howards' admissions, the Howards acquiesced as a matter of law.  We are not prepared to make such a definitive rule of law.  To begin with, most of the cases the State cites

in support of its position are procedurally distinguishable because the appellate courts *affirmed* the trial court's decisions in those cases. *Grogan*, 141 Ohio App.3d 733; *State ex rel. Stern v. Butler*, 7th Dist. No. 98-JE-54 (Sept. 26, 2001); *State ex rel. Cleveland Director of Law v. Alahmad*, 8th Dist. No. 86447, 2006-Ohio-804. Notably, the only case the State cites where the appellate court reversed involved a trial court that had applied the incorrect rule of law. *State ex rel. City of Cleveland v. The Beehive Tavern*, 8th Dist. No. 78252 (June 7, 2001). The trial court here applied the correct rules of law. Furthermore, the trial court here reached its decision by emphasizing that the State failed to meet its burden of proof at trial, i.e. to *clearly and convincingly* prove that the Howards acquiesced in the perpetuation of the nuisance at their market. Upon review, we cannot conclude that the trial court's determination in that regard was erroneous as a matter of law, especially in light of our limited standard of review.

{¶41} The State's sole assignment of error is, therefore, overruled.

{¶42} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, J., and WILLAMOWSKI, J., concur.**

**/jlr**

-27-