[Cite as *State ex rel. Pfeiffer v. Red Carpet Inn*, 2015-Ohio-4035.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Columbus City Attorney :
Richard C. Pfeiffer, Jr.,

: 

Plaintiff-Appellee, : No. 14AP-506
(M.C. No. 2014 EVH 60019)
:

v. :

: (REGULAR CALENDAR)

Red Carpet Inn et al.,

:

Defendants-Appellants.

:

---

D E C I S I O N

Rendered on September 30, 2015

---

*Richard C. Pfeiffer, Jr.*, City Attorney, *Westley M. Phillips*, and *William A. Sperlazza*, for appellee.

*Sanjay K. Bhatt*, and *Jerry Stollings*, for appellants.

*Barren & Merry Co., L.P.A.*, and *James H. Cannon*, for Amicus Curiae Ridgestone Bank.

---

APPEAL from the Franklin County Municipal Court,
Environmental Division.

BROWN, P.J.

{¶ 1} This is an appeal by defendants-appellants, Red Carpet Inn, Sunstar Columbus, Inc. ("Sunstar"), Punarvasu S. Patel, Dharmendra K. Patel, Harihar Patel, Rakeshbhaik Patel, and Minal Patel, from a judgment of the Franklin County Municipal Court, Environmental Division, granting injunctive relief in favor of plaintiff-appellee, Richard C. Pfeiffer, Jr., Columbus City Attorney, to abate a nuisance on property owned by appellants.

{¶ 2}   Sunstar, an Ohio corporation formed in May 2013, has four shareholders: Dharmendra K. Patel (hereafter " Dharmendra"), the president of Sunstar, Punarvasu S. "Dipen" Patel (hereafter "Dipen"), the statutory agent for Sunstar, Harihar Patel (hereafter "Harihar"), and Minal Patel (hereafter "Minal").  On August 15, 2013, Sunstar purchased property and a hotel, formerly operated under the name "Motel 6," located at 1289 East Dublin Granville Road, Columbus.  Sunstar began operation of the hotel in August 2013 as the "Red Carpet Inn."  Minal and her husband, Rakeshbhaik Patel, resided at the Red Carpet Inn from August 15, 2013 until January 22, 2014; Minal worked at the front desk and managed the hotel staff.

{¶ 3}   On January 21, 2014, appellee filed a complaint for temporary and permanent injunctive relief against appellants regarding the real property and hotel business located at 1289 East Dublin Granville Road.  The complaint alleged that the premises constituted a nuisance, as defined under R.C. 3719.10 and 3767.01, subject to abatement under R.C. Chapter 3767.  According to the allegations in the complaint, the property had been used for "the purpose of trafficking, possessing or abusing controlled substances," in violation of R.C. 2925.03, as well as "conduct associated with lewdness, assignation, or prostitution."  On the same date, the trial court granted an ex parte temporary restraining order in favor of appellee and ordered closure of the premises "until a final decision is rendered on the Complaint."

{¶ 4}   The trial court scheduled a hearing on appellee's request for preliminary and permanent injunctive relief for January 29, 2014.  By request of the parties, the trial court continued the case with the temporary restraining order to remain in effect during pendency of the proceedings.  The case was tried to the court on April 14, 2014.  At trial, appellee presented testimony from several witnesses, including law enforcement personnel, who described the general reputation of the property located at 1289 East Dublin Granville Road as a place where drug activity and prostitution occurred on a regular basis.  Appellee also introduced evidence of nine felony drug violations arising out of police sting operations at the hotel, as well as multiple reported instances of illegal prostitution at the hotel involving ten different women and resulting in ten convictions.

{¶ 5}   On May 27, 2014, the trial court rendered a decision, finding that "the property constitutes a nuisance pursuant to R.C. Chapter 3767 and R.C. 3719.10" and that

appellants "are guilty of maintaining a nuisance in violation of law." The court further determined that appellants "are not 'innocent property owners' as defined by the Ohio Supreme Court, thus subjecting the premises to the statutory remedy of closure set forth in R.C. 3767.06(A)." By judgment entry filed on that same date, the trial court permanently enjoined appellants from maintaining a public nuisance and ordered that the building "shall remain closed and boarded against any use whatsoever for a period of one year commencing this date."

{¶ 6} On appeal, appellants set forth the following three assignments of error[1] for this court's review:

> [I.] The trial court erred by failing to apply the standard of proof of clear and convincing evidence in its findings and in granting the injunctive relief to Appellee.
>
> [II.] The trial court's decision and judgment granting Appellee's motion for preliminary and permanent injunction was against manifest weight of the evidence.
>
> [III.] The Trial Court erred and exceeded the mandates of Revised Code section 3767.06(A) by ordering a closure of the Hotel Premises beyond the one year closure from the date of the initial closure.

{¶ 7} Appellants' first and second assignments of error are interrelated and will be considered together. Under the first assignment of error, appellants argue that the trial court, in its decision granting injunctive relief, failed to mention or indicate it considered the clear and convincing standard of proof necessary to warrant such relief. Under the second assignment of error, appellants contend the trial court's decision granting appellee's motion for a permanent injunction was against the manifest weight of the evidence.

---

[1] We note that this court granted a motion for leave by Ridgestone Bank to file a brief as amicus curiae. The brief of amicus curiae offers arguments in support of issues raised under appellants' third assignment of error, but also raises a statutory constitutional challenge not raised by the parties. Amicus curiae "may not raise issues as to the constitutionality of a statutory provision where such issue is not raised by the parties to the action." *State v. Webb,* 6th Dist. No. L-76-309 (Nov. 8, 1977). *See also State v. D.M. Pallet Serv., Inc.,* 10th Dist. No. 94APC02-195 (Nov. 15, 1994) ("*Amicus Curiae* has no right to become a party to an action and thus may not raise issues or claims not raised by the parties.").

{¶ 8}   In *State ex rel. Columbus City Attorney v. Columbus Inn & Suites,* 10th Dist. No. 14AP-132, 2014-Ohio-4358, ¶ 11-15, this court noted the procedures under R.C. Chapter 3767 in nuisance abatement proceedings stating, in part, as follows:

> Pursuant to R.C. 3767.02(A), "[a]ny person, who uses, occupies, establishes, or conducts a nuisance" and "the owner * * * of an interest in any such nuisance" is "guilty of maintaining a nuisance and shall be enjoined as provided in" R.C. 3767.03 to 3767.11. The attorney general, a village solicitor, a city or township director of law, a prosecuting attorney, or a private citizen "may bring an action in equity in the name of the state * * * to abate the nuisance and to perpetually enjoin the person maintaining the nuisance from further maintaining it." R.C. 3767.03.
>
> At the same time the relator files a nuisance complaint, he or she may apply for a preliminary injunction pursuant to R.C. 3767.04(B).
>
> The trial court must hold a hearing on an application for a preliminary injunction within ten days of the filing of the application.   R.C. 3767.04(B)(1). * * * If the hearing goes forward and, at the hearing, the relator satisfies the trial court that he or she can sustain the allegations of the complaint, the court must issue a preliminary injunction restraining the respondent and any other person from continuing the nuisance. *Id.*
>
> A property owner may preempt the entry of a preliminary injunction or seek its termination by posting a bond for the full value of the property * * * and promising to immediately "abate the nuisance and prevent it from being established or kept" until a decision on the nuisance complaint. R.C. 3767.04(C).
>
> The relator must prove his case at trial.   If the relator succeeds, the trial court must enter a judgment that (1) "perpetually enjoins the [respondent] and any other person from further maintaining the nuisance at the place complained of and the [respondent] from maintaining the nuisance elsewhere," R.C. 3767.05(D), and (2) orders the abatement of nuisance, R.C. 3767.06(A).

(Citations omitted.)

{¶ 9} For purposes of R.C. Chapter 3767, "the word 'nuisance' means: (1) '[t]hat which is defined and declared by statutes to be a nuisance,' and (2) '[a]ny place in or upon which lewdness, assignation, or prostitution is conducted, permitted, continued, or exists.' " *Id.* at ¶ 19, citing R.C. 3767.01(C)(1) and (2). Further, "R.C. 3719.10 states that '[p]remises or real estate * * * on which a felony violation of Chapter 2925. [drug offenses] or 3719. [Controlled Substances Act] of the Revised Code occurs constitute a nuisance subject to abatement pursuant to Chapter 3767. of the Revised Code.' " *Id.* at ¶ 19.

{¶ 10} In *Columbus Inn & Suites* at ¶ 20-21, this court also discussed the relator's burden of establishing evidence of a nuisance, holding in relevant part:

> In a civil action brought under R.C. 3767.03, the relator bears the burden of proving his case by clear and convincing evidence. * * * Clear and convincing evidence of the existence of a nuisance suffices to prove the property owner guilty of maintaining a nuisance. * * * Further evidence is necessary, however, to obtain a permanent injunction closing the premises that constitutes the nuisance. For a court to order the closure of the premises against all purposes, the relator must also prove by clear and convincing evidence that the owner acquiesced to or participated in the creation and/or perpetuation of the nuisance. * * * If the trial court finds the relator's evidence unpersuasive or insufficient, and the court instead determines "that a defendant owner acted in good faith, was innocent of any acquiescence to or participation in the conduct establishing the nuisance, and took prompt action to abate the nuisance," then the court may not issue a closure order under R.C. 3767.06(A).
>
> Pursuant to R.C. 3767.05(A), "evidence of the general reputation of the place where the nuisance is alleged to exist or an admission or finding of guilt of any person under the criminal laws against prostitution, lewdness, assignation, or other prohibited conduct at the place * * * is prima-facie evidence of * * * knowledge of and of acquiescence and participation in the nuisance on the part of the person charged with maintaining it." Thus, a relator may meet his burden of proving acquiescence or participation with three different types of evidence: direct evidence, evidence of a property's general reputation, and evidence of convictions resulting from activities at the site of the alleged nuisance.

(Citations omitted.)

{¶ 11} In challenging the trial court's judgment as against the manifest weight of the evidence, appellants assert that appellee failed to demonstrate appellants had actual or constructive knowledge of, and either acquiesced to or participated in, a felony violation of R.C. Chapters 2925 or 3719. Appellants contend the Columbus Police Department failed to provide them with information about drug and prostitution activity occurring at the hotel, including information about undercover drug purchases, and that their knowledge of such activity was limited. Appellants further argue that law enforcement personnel failed to inform Minal as to the identity of individuals charged as a result of a search warrant executed at the hotel on October 2, 2013, nor did officers inform her of the arrest of Paul Fields occurring on December 30, 2013, which resulted in the discovery of a methamphetamine lab in one of the hotel rooms. Appellants also challenge the trial court's findings with respect to state fire marshal inspections and licensing issues.

{¶ 12} In its decision, the trial court held that appellee presented evidence demonstrating that appellants "possessed actual knowledge of the nuisance conditions at 1289 East Dublin Granville Road." The evidence cited by the court included: (1) testimony by Columbus Police Officer Scott Clinger that he "sent nuisance warning letters by certified mail – signed for and received – to the corporate officers of Sunstar * * * notifying them of the illegal drug and prostitution activity occurring at the Red Carpet Inn," (2) testimony by Minal that she met with Officer Clinger "6-7 times to discuss issues surrounding criminal activity on the premises," (3) testimony by Columbus Police Officer Thomas Pellegrini "that he specifically told Minal Patel about drug and prostitution activity occurring at the hotel, including the names of people involved," and (4) Minal's signature to a receipt "acknowledging that she was given a copy of a search warrant executed at the hotel on October 2, 2013 for illicit drug trafficking."

{¶ 13} The trial court further determined that appellants "neither acted in good faith nor took prompt action to abate the nuisance at their property." Specifically, the court noted, "[u]pon learning of the nuisance conditions [appellants] did very little. Despite their knowledge of the extensive criminal activity taking place, Punarvasu Patel, Harihar Patel and Dharmendra Patel rarely visited the hotel." The trial court cited evidence that "Harihar only visited the hotel on 2 occasions since its opening, Dharmendra only once. Punarvasu would stop by once or twice a week but only for very

brief periods of time." The court observed that "[a]ll three of these owners had the power to remove Minal Patel as the manager of the hotel once it became clear that she was incapable of controlling the rampant criminal activity that they had received numerous warnings about from police," but that "[s]uch a move was never made nor even discussed."

{¶ 14} The trial court also addressed various measures cited by appellants as evincing an attempt on their part to combat illegal activities that plagued the Red Carpet Inn, including calls placed by Minal to the police, management's hiring of special duty police officers, the hotel's creation of a "Do Not Rent List" designating certain individuals as unsavory, and its purchase of new phones and video surveillance equipment. In considering these claims, the court determined that many of the measures taken by appellants "were merely 'lip service' that was paid in an attempt to appease the authorities." For instance, in addressing the hotel's utilization of a "Do Not Rent List," the trial court found the list to be "a hand-written mess that was routinely ignored." The court credited testimony by Officer Pellegrini that he provided Minal with specific names of drug dealers and prostitutes working out of the Red Carpet Inn; further, while the hotel added these names to the "Do Not Rent List," the court noted that "many of these individuals returned to the hotel anyway, including Paul Fields and Miranda Johnson." The trial court concluded that appellants "were willing to look the other way and ignore their own safety protocols so long as there was * * * cash coming through the door."

{¶ 15} With respect to service calls placed by Minal to the Columbus police, the trial court observed that such calls appeared "to be more *in response* to criminal activity that was invited by the Red Carpet Inn by ignoring repeated drug and prostitution activity as opposed to *preventing* such crimes." (Emphasis sic.) The court found that "other so-called security measures [by appellants] either fell short or were non-existent." In considering the hotel's practice of hiring police officers for special duty assignments, the trial court cited evidence that these shifts "were cut in half compared to when Motel 6 was operating the hotel prior to August, 2013." Further, the court noted, despite "the obvious spike in criminal activity that took place when these shifts were cut," appellants "failed to either restore the previous special duty hours or hire private security." The court also noted "the video surveillance equipment that was purchased was never installed." The

trial court concluded that such "half-measures" by appellants did "not constitute good faith" on their part.

{¶ 16} As set forth above, appellants contend the Columbus Police Department failed to provide them with information regarding criminal activity at the hotel, asserting they had limited knowledge of such activity. Specifically, appellants challenge findings by the trial court with respect to: (1) felony violations of R.C. Chapter 2925 occurring at the hotel from September 19, 2013 through January 15, 2014, (2) the execution of a search warrant for Room 142 on October 2, 2013, during which police seized heroin, cocaine, marijuana, and syringes, (3) the discovery by police officers, on December 30, 2013, of methamphetamine materials in one of the hotel rooms, and (4) illegal prostitution activity at the hotel.

{¶ 17} At trial, appellee presented the testimony of various law enforcement personnel regarding criminal activity at the Red Carpet Inn. Columbus Police Detective Karl Shaw testified that he utilized confidential informants to make controlled drug purchases at the hotel on a number of occasions. Specifically, on September 19, 2013, a confidential informant went inside Room 228 of the Red Carpet Inn and purchased ".1 grams of crack cocaine." (Tr. 42.) On October 2, 2013, an informant purchased ".1 grams of heroin" from Room 142. (Tr. 45.) On that same date, police obtained a search warrant for Room 142; during the ensuing search, police officers found heroin, money, a digital scale, four cell phones, a GPS, and three syringes. Detective Shaw testified that law enforcement personnel gave a copy of the search warrant to Minal at the hotel.

{¶ 18} On November 8, 2013, a confidential informant made a purchase inside Room 138, and the substance later tested positive for cocaine. On December 6, 2013, an informant purchased heroin from Room 128. On December 11, 2013, a confidential informant purchased crack cocaine from Room 224; the following day, an informant purchased crack cocaine from Room 132. On December 30, 2013, a confidential informant purchased ".1 grams of heroin" from Room 232. (Tr. 56.) On January 7, 2014, a confidential informant purchased ".1 grams of heroin" from Room 229. (Tr. 58.)

{¶ 19} Detective Shaw also testified as to criminal complaints filed charging solicitation for prostitution on the premises of the Red Carpet Inn. At trial, he identified complaints alleging solicitation occurring at the hotel on the following dates:

September 18, 21 and 23, 2013, October 5, 15 and 18, 2013, November 13, 2013, December 11 and 27, 2013, and January 4, 2014. Detective Shaw testified that the Red Carpet Inn had a general reputation as "a one stop shop for any of your vices. You have your drugs, you have your prostitution. I mean, everything was located right there in that hotel." (Tr. 93.)

{¶ 20} Officer Clinger testified that he was familiar with criminal activity occurring at the subject premises both before and after Sunstar's purchase of the hotel. On August 22, 2013, Officer Clinger visited the Red Carpet Inn and spoke with Minal and Rakeshbhaik about criminal activity at the hotel; the officer also spoke by telephone with Harihar. On August 25, 2013, Officer Clinger sent nuisance letters to Dipen, the general manger of the Red Carpet Inn, and to Harihar, in order to provide these individuals "notice there have been problems on the premises and that we could not continue to have the same problems or we would be basically in a nuisance abatement situation." (Tr. 131.) At trial, appellee introduced copies of those letters into evidence. On October 3, 2013, Officer Clinger sent a nuisance abatement warning letter to Harihar referencing an incident at the hotel on October 2, 2013. Attached to the letter was a copy of a search warrant. Also on October 3, 2013, Officer Clinger went to the hotel and handed Minal a copy of the search warrant.

{¶ 21} On November 25, 2013, Officer Clinger accompanied the state fire marshal on a hotel inspection regarding "a bed bug complaint in a specific room on the second floor." (Tr. 137.) During that inspection, Officer Clinger received a radio report that a witness had just observed a "male black with a gun put it to a female white's head and drag her into" Room 132. (Tr. 138.) Officer Clinger and several other officers entered the room and recovered a weapon; the officers also discovered "syringes, some burnt spoons in the room, [and] pills." (Tr. 138.) Officer Clinger subsequently learned that the room was registered in the name of David Moffatt. Officer Clinger spoke to Minal, informing her there were five individuals inside the room, and "not one person in that room knew who the room was registered to." (Tr. 141.) The officer told Minal that "she needed to keep him [Moffatt] out of the hotel." (Tr. 141.) Minal indicated to Officer Clinger that it was not possible "[t]o check all the IDs of everyone that was staying there or visiting." (Tr. 142.)

{¶ 22} On November 27, 2013, Officer Clinger and several other officers accompanied the fire marshal on a follow-up inspection on the hotel premises. At that time, Officer Clinger observed David Moffatt walk onto the property. Officer Clinger accompanied Moffatt to the office and the officer told Minal: "Here is Mr. Moffatt. You need to tell him to leave; don't come back ever." (Tr. 144.) On December 9, 2013, Officer Clinger mailed nuisance abatement warning letters to Dipen and Harihar, advising the "ownership and the management" that activity involving prostitution "has been continuing." (Tr. 148.)

{¶ 23} According to police records, law enforcement personnel responded to 358 service calls during 2013 at the Red Carpet Inn. Officer Clinger testified that the number of service calls was the most for any hotel in the area. When questioned about the general reputation of the hotel, Officer Clinger responded that the hotel was a place where you could purchase "any drug and it was a place where you could get a prostitute. It had crime in it, it had crime around it. Because it bled out into the neighborhoods, the drug dealers, the drug users had to support their habits and they started breaking into cars and houses and that kind of thing." (Tr. 162-63.)

{¶ 24} On November 27, 2013, Columbus Police Officer Samuel Rippey was dispatched to the Red Carpet Inn. Upon entering Room 143, Officer Rippey observed a male lying on the floor with a gunshot wound. An investigation indicated the shooting arose out of a robbery involving "money and drugs." (Tr. 471.) Other individuals were inside the room when the officer arrived, including a "known prostitute." (Tr. 472.) During the last five months of 2013, Officer Rippey responded to service calls at the hotel an average of "[t]wo to three times a week." (Tr. 472.) Officer Rippey described the Red Carpet Inn as a "[p]roblem spot" for drugs and prostitution. (Tr. 474.)

{¶ 25} Columbus Police Officer Pellegrini previously worked special duty assignments at the hotel when it was under operation as a Motel 6. The Motel 6 would typically hire special duty officers "six shifts a week, Tuesday through Saturday, and then they fluctuated between assigning Sunday and Monday." (Tr. 486.) The Motel 6 "had several employees who were familiar with the people in the area, so they avoided renting rooms to people who they thought were suspicious or possibly involved in illicit behavior."

(Tr. 486.)  The Motel 6 also "maintained a Do Not Rent List, which they strictly enforced." (Tr. 487.)

{¶ 26} Officer Pellegrini also worked special duty assignments for the Red Carpet Inn after it began operations in August 2013.  He testified as to changes at the hotel after the ownership changed, stating that the hotel "cut in half" the hours for special duty officer assignments, reducing such assignments to three days.  (Tr. 489.)  Officer Pellegrini was unavailable for special duty assignments at the hotel for several months during Fall 2013; when he returned to the hotel in November 2013, he observed "more drug users wandering around on the property, a lot more traffic in the lot."  (Tr. 492.) Officer Pellegrini was "concerned about drug activity; people taking the rooms to sell drugs or to use drugs," and he advised the hotel staff to pay attention to patrons "staying there a long time," and to question "why somebody with a local address would be in need of a hotel room."  (Tr. 494.)

{¶ 27} On December 7, 2013, Minal informed Officer Pellegrini that one of the hotel rooms had a broken lock and that individuals may have been trespassing.  The officer went to Room 230, located in the back of the building, and found the door ajar; when the officer entered the room, he came into contact with a female and two males "who appeared as though they were in the midst of a sexual rendezvous."  (Tr. 494.)  The woman was later identified as Miranda Johnson.  Officer Pellegrini stated that the room was in "complete disorder."  (Tr. 495.)  He noted "garbage throughout the room, * * * blood on the floor" and "blood on the sheets."  (Tr. 495.)  The officer observed "dozens of drug abuse instruments littered throughout the room, syringes, spoons, bottle caps, things that would indicate heroin use."  (Tr. 495.)  He also noted "used prophylactics in the toilet," and "clothing discarded everywhere."  (Tr. 495.)  The room appeared to have been in that condition "for some time."  (Tr. 496.)  The door to the room "had been tampered with to the point that the door would still close, but it was incapable of being locked."  (Tr. 495.)

{¶ 28} Later that evening, Officer Pellegrini observed a male and a female exit Room 234 "on that same level, walk to room 230, the unsecured room, and the female immediately opened the door and went into the room."  (Tr. 496.)  It appeared to the officer that the female "expected the room to be unlocked and to be ready to use."  (Tr.

496.)  Officer Pellegrini exited his vehicle and spoke with these individuals, learning that the woman's name was Jennifer Glaser, and that the man's name was David Moffatt. Glaser provided the officer with information regarding "illicit * * * and illegal activity that was occurring at the Red Carpet Inn."  (Tr. 499.)  Glaser told the officer "about drug dealers that were staying in the motel.  She began giving me their names and room numbers and what they were doing when they would sell heroin, crack or, in some cases, women."  (Tr. 499-500.)

{¶ 29} Officer Pellegrini "compiled a list and gathered that information to provide to the motel, to take action."  (Tr. 500.)  Officer Pellegrini "immediately made contact with Minal and told her that they needed to do whatever was possible to secure that room because it was incapable of being dead bolted or locked."  (Tr. 495.)  The officer also told Minal about the information provided by Glaser, including "the room numbers and persons who were suspected to be selling drugs, prostituting women, and other illegal behavior."  (Tr. 503.)  One of the individuals identified was Paul Fields.

{¶ 30} A few weeks following the events of December 7, 2013, Officer Pellegrini observed Paul Fields and Miranda Johnson enter Room 234 of the hotel.  The officer went to the room and told Fields he "was banned from the property."  (Tr. 504.)  There were "four to five females in the room who were all up on the bed.  They all had an appearance that they were heavy drug users."  (Tr. 504.)  A front desk employee at the Red Carpet Inn informed Officer Pellegrini that Fields was a "drug dealer and he had attempted to establish himself on the property during the Motel 6 days, but that Motel 6 had kept him out."  (Tr. 507.)  Officer Pellegrini also learned from the employee that Sherman Tanner, described to the officer as an individual "responsible for a lot of the illicit behavior and illegal activity," had "arrived back on the property."  (Tr. 509.)

{¶ 31} In January 2014, Officer Pellegrini was on special duty when other police officers conducted a vice raid.  Officer Pellegrini went to the back of the hotel and observed Miranda Johnson, who had an outstanding warrant for solicitation.  The officers told Officer Pellegrini that "they had * * * the elements for solicitation on this encounter * * * and also possession of heroin."  (Tr. 512.)  The officers requested that "the other persons in the room be evicted and that the room be made secure."  (Tr. 512.)  Officer Pellegrini stated that the room "was littered in drug paraphernalia."  (Tr. 513.)  A vice

detective gathered a plastic bag filled with "needles, spoons, baggies, dozens and dozens of drug abuse instruments." (Tr. 513.) Officer Pellegrini also noted the room "was in complete disorder and it had the appearance that the persons * * * had been staying in there quite some time." (Tr. 513.) Officer Pellegrini testified that the general reputation of the Red Carpet Inn "is a place to secure drugs, use drugs, drink alcohol, engage in prostitution and party." (Tr. 515.)

{¶ 32} On December 30, 2013, Columbus Police Officers James G. Murawski and Kelly Melvin responded to a dispatch reporting a domestic violence incident at the Red Carpet Inn. The officers went to Room 205 of the hotel, where they found Rachel Sullivan, Paul Fields, and a 15-year old female. The officers arrested Fields for domestic violence threats, menacing, and unlawful restraint. (Tr. 539.) The officers received permission from Fields to search the room, and they discovered two bags with "chemicals used to manufacture meth, along with some sort of cooking device." (Tr. 536.) Subsequent laboratory testing revealed "the baggy of white powder * * * found in the room" contained "methamphetamine." (Tr. 539.)

{¶ 33} Between August 2013 and January 2014, Officer Murawski was dispatched to the Red Carpet Inn "[p]robably two to three" times per week. (Tr. 541.) The calls were "[m]ostly narcotics complaints," but also involved "[p]rostitution or soliciting." (Tr. 541.) Officer Murawski testified that the general reputation of the Red Carpet Inn is "an easy spot to go to get narcotics * * *. It is active." (Tr. 541.)

{¶ 34} Appellee also presented the testimony of Tamika Roy, a former employee of the Red Carpet Inn, who worked third-shift at the front desk of the hotel, and who had previously worked at the hotel while under operation as Motel 6. She stated that criminal activity at the hotel increased after the Red Carpet Inn began operations. Roy testified that Minal knowingly rented rooms to individuals involved in drugs and prostitution, including individuals whose names appeared on the "Do Not Rent List." Roy was familiar with David Moffatt, an individual whose name was on the "Do Not Rent List," and she personally observed Minal rent a room to Moffatt. She also observed Minal interacting in daily discussions with Moffatt, as well as Sherman Tanner, an individual Roy described as involved in drugs and prostitution. Minal also engaged in conversations with Paul Fields at the front desk. Roy testified that customers sometimes negotiated with Minal for lower

room prices, and that Minal granted requests by customers who wanted to rent a room in the back of the hotel, or who did not want housekeeping in their room.

{¶ 35} Roy's former employer, the Motel 6, created a "Do Not Rent List" that the hotel maintained on a computer system. In August 2013, when Sunstar took over operation of the hotel, the new owners were provided a copy of Motel 6's "Do Not Rent List." The information was not part of a computer program; rather, employees were required to utilize a printed list. The Motel 6 also had a practice of hiring special duty Columbus police officers to work five to six nights a week. Roy testified that management for the Red Carpet Inn decreased special duty officer shifts to "[t]hree, sometimes two" nights. (Tr. 447.) According to Roy, the primary concern of ownership was "[s]elling rooms and making money" as opposed to keeping drugs or prostitution off the premises. (Tr. 449.)

{¶ 36} Kirk Bennett, the general manager of a Popeye's restaurant located at 1275 East Dublin Granville Road, testified that he was familiar with the Red Carpet Inn, which is located next door to the restaurant. Bennett stated that the general reputation of the Red Carpet Inn is "[d]rugs and hooker[s]" and that the hotel was detrimental to other businesses in the area. (Tr. 649.) Bennett testified that individuals from the hotel would "hang[] around the businesses, offering * * * to sell their body to the customers or asking the customers if they want * * * to come over to the Red Carpet Inn for four hours, five hours." (Tr. 649.) These individuals would also "ask for money [and] ask the customers to buy them food. They would offer sex to the customers." (Tr. 652.)

{¶ 37} Hotel patrons also came inside the restaurant to use the restrooms, and some would lock themselves inside the restroom for "[t]hirty minutes to an hour." (Tr. 654.) Bennett testified as to finding "needles on the floor and * * * blood splashed all over the bathroom." (Tr. 654.) On one occasion, a male and a female were both inside the restroom at the same time. As a result of these activities, the restaurant changed their policy and installed locks on the restroom doors, requiring customers to request a key at the front counter.

{¶ 38} Michael Harris, a state certified fire safety inspector for the Bureau of Code Enforcement, provided testimony as to several inspections he conducted at the Red Carpet Inn during 2013. On August 22, 2013, Harris conducted an inspection of the

property and "found several rooms with stained mattresses, stained box springs, stained pillows and bedding, stained walls, ceilings and/or carpets, light fixtures loose from the ceiling." (Tr. 568.) He also noted "no current license to operate." (Tr. 568.) During an inspection on September 10, 2013, Harris noted "some outstanding violations," including stained mattresses and stained box springs in several rooms. (Tr. 572.) Harris returned to the premises on November 25, 2013, and that inspection indicated violations of Ohio hotel laws and a state fire code violation. During an inspection on December 30, 2013, Harris noted "sanitary issues, and still operating without a license." (Tr. 573-74.) The evidence at trial indicated that the Red Carpet Inn subsequently obtained state licensure effective January 1, 2014.

{¶ 39} Minal testified on behalf of appellants and was also called as a witness as on cross-examination by appellee. The Red Carpet Inn opened August 16, 2013, and Minal and her husband resided at the hotel from August 15, 2013 until January 22, 2014; Minal was physically present at the Red Carpet Inn approximately 24 hours a day, seven days a week during that time. Dipen would come to the hotel once or twice a week and stay several hours each time. During the time period from August 2013 through January 2014, Harihar visited the Red Carpet Inn on two occasions, while Dharmendra visited the hotel on one occasion. During 2013, the hotel did not have a state fire marshal license to operate.

{¶ 40} Minal testified that the hotel requires patrons to present identification, which hotel employees scan, and the hotel then requests a second form of identification. Minal agreed that the Red Carpet Inn is a violent and dangerous place. A police officer informed Minal of an incident on November 25, 2013, in which a man held a gun to the neck of a woman in Room 132. Two days later, someone shot an individual inside Room 243. At trial, Minal identified her signature on a receipt for a search warrant executed for Room 142 on October 2, 2013. Minal acknowledged she did not inform either Harihar or Dharmendra about the warrant. Following the search, Minal told Dipen that officers had found heroin in the room.

{¶ 41} Officer Clinger spoke with Minal at the hotel, and the officer recommended that the staff clean each room every day or at least every other day. Officer Clinger also recommended that the hotel accept payment with credit cards as opposed to cash. Minal

acknowledged it was more common for patrons to pay with cash rather than by credit card. During January 2014, hotel records indicated cash payments of $31,239.44, and credit card payments in the amount of $5,902.47. Minal acknowledged that the Red Carpet Inn did not have working security cameras at the hotel between August 2013 and January 2014. She also acknowledged that one of the hotel rooms did not have a working lock and that individuals were using the room to commit acts of prostitution.

{¶ 42} The hotel kept a "Do Not Rent List" at the check-in counter, but there was no electronic copy of the list, nor did the hotel have a typed copy. Minal acknowledged that the hotel sometimes rented rooms to individuals on that list. On weekends, the hotel hired special duty police officers. The hotel also ordered outside security cameras, but did not have the opportunity to install them. Minal testified that she would contact the police if she observed a problem at the hotel. Minal received information on October 18, 2013 that an individual named David Moffatt was involved in prostitution and drugs, and the hotel placed his name on the "Do Not Rent List" at that time. Minal acknowledged that the hotel subsequently rented rooms to this individual on 25 occasions. Minal stated this was "maybe a mistake." (Tr. 421.)

{¶ 43} An appellate court "will not reverse judgments supported by some competent, credible evidence as being against the manifest weight of the evidence." *Columbus Inn & Suites* at ¶ 24, citing *C.E. Morris Co. v. Foley Constr. Co.,* 54 Ohio St.2d 279, 280 (1978).

{¶ 44} Upon review, the record contains competent, credible evidence to support the trial court's determination that the premises constituted a nuisance and that appellants failed to act in good faith and acquiesced to the nuisance conditions. At trial, appellee presented both prima facie and direct evidence of appellants' knowledge and acquiescence. As noted above, various law enforcement personnel and other individuals testified as to the hotel's general reputation as a place where drugs and prostitution were readily available. Appellee also submitted evidence as to multiple felony drug activities, as well as multiple convictions for prostitution occurring at the hotel. Further, there was competent, credible evidence that police officers provided notice of the rampant drug and prostitution activities taking place at the hotel, including evidence as to nuisance abatement letters sent by law enforcement personnel to management on three different

occasions, face-to-face meetings between police officers and Minal, and Minal's signature acknowledging receipt of a search warrant. In addition to multiple meetings between Officer Clinger and Minal, there was also testimony by Officer Pellegrini that he provided Minal with names and room numbers of persons "suspected to be selling drugs, prostituting women, and other illegal behavior." (Tr. 503.) Thus, appellee presented direct evidence going to the issue of knowledge of and acquiescence to perpetuation of the nuisance. *See Columbus Inn & Suites* at ¶ 28 (letter delivered by police officers to owner informing him of illegal drug activity and prostitution at hotel, as well as owner's knowledge of search warrant executed at hotel, constituted direct evidence that owner knew of and acquiesced to criminal activity at hotel).

{¶ 45} While appellants presented testimony by Minal that she attempted to follow suggestions by police officers regarding steps to address the pervasive problems at the hotel, the trial court viewed such efforts as less than credible. Specifically, the trial court found that appellants "often seemed all too willing to ignore the obvious dangers and criminal activity taking place right under their noses so long as the money was coming in. * * * Rather than taking aggressive efforts to rid their hotel of drug dealers, prostitutes and other criminals, the owners of the Red Carpet Inn instead appeared to *compete* for their business." (Emphasis sic.) By way of example, the trial court cited testimony by Minal who, "when questioned why the Red Carpet Inn continued to operate a predominantly cash business despite suggestions by police to accept only credit cards, * * * bluntly stated that they would only do so once the other hotels in the area did so as well." Based upon the evidence presented, the trial court concluded that "[t]he safety and security of the Red Carpet Inn's residents and neighbors was trumped by the cash from drug dealers and prostitutes."

{¶ 46} In general, a reviewing court will "defer to the findings of the trial court since it is in the best position to observe the witnesses and weigh their credibility." *Kilbarger v. Anchor Hocking Glass Co.,* 120 Ohio App.3d 332, 340 (5th Dist.1997). Here, the trial court considered the testimony presented by appellants as to measures they took to prevent illegal activity. As indicated above, the court found such evidence less than credible in light of all the evidence regarding drug and prostitution activity at the hotel. Based upon the evidence presented, the trial court could have reasonably concluded that

appellants had knowledge of and acquiesced to the nuisance conditions, and we find no merit in appellants' manifest weight challenge.

{¶ 47} As noted, appellants also contend the trial court erred by failing to apply the standard of proof of clear and convincing evidence. Specifically, appellants argue that, because the words "clear and convincing evidence" do not appear in the trial court's judgment entry, it can only be concluded that the court failed to apply the requisite standard of proof in its findings and decision. We disagree.

{¶ 48} At the outset, there is nothing in the record to indicate the trial court applied a different standard of proof in this case. We note that the parties cited the appropriate standard in filings before the trial court and, "absent affirmative language in the court's decision suggesting its application of an incorrect standard, we presume regularity." *Fifth Third Bank v. Jarrell,* 10th Dist. No. 04AP-358, 2005-Ohio-1260, ¶ 13. Further, while the trial court did not expressly recite the "clear and convincing" standard of proof, the record supports the trial court's findings by clear and convincing evidence. *See In re C.M.L.,* 2d Dist. No. 2010CA0002, 2011-Ohio-1132, ¶ 45 (despite trial court's failure to indicate in judgment entry it applied "clear and convincing evidence" standard, "it is obvious that clear and convincing evidence exists to support the findings the trial court made," and "there is nothing in the record that demonstrates that the trial court applied another legal standard in making its findings"). Here, the record supports the trial court's findings and, presuming regularity in the proceedings, we find no error as a result of the trial court's failure to explicitly recite the standard of review in its judgment entry.

{¶ 49} Because there was competent, credible evidence to support the trial court's determination that the premises constituted a nuisance and that appellants acquiesced in the perpetuation of the nuisance conditions, the trial court did not err in granting a permanent injunction to abate such nuisance. Based upon the foregoing, appellants' first and second assignments of error are without merit and are overruled.

{¶ 50} Under the third assignment of error, appellants argue that the trial court erred in failing to limit the hotel's closure to one year from the date the court issued the temporary restraining order. Appellants cite paragraph five of the trial court's judgment entry, which states in part: "Pursuant to R.C. 3767.04(A), the building located at 1289

East Dublin Granville Road Columbus, Ohio shall remain closed and boarded against any use whatsoever for a period of one year commencing this date."  Appellants contend that, in accordance with the provisions of R.C. 3767.06(A) and the Supreme Court of Ohio's decision in *State ex rel. Pizza v. Rezcallah,* 84 Ohio St.3d 116 (1998), closure of a property is limited to only one year.  According to appellants, if the trial court grants a preliminary injunction, as in the instant case, the one-year closure commences from the date of the preliminary injunction.

{¶ 51} In response, appellee argues the Supreme Court's decision in *Rezcallah* does not hold that the one-year closure period starts from the date a trial court issues a preliminary injunction.  Appellee further argues that this court has previously rejected the same argument advanced by appellants.  We agree.

{¶ 52} R.C. 3767.04 "discusses the standard required to obtain a temporary injunction in a nuisance action, and the length of a closure order stemming from the injunction."  *State ex rel. Rothal v. Smith,* 151 Ohio App.3d 289, 2002-Ohio-7328, ¶ 95 (9th Dist.).  R.C. 3767.04(B)(3) states, in part, as follows:

> If * * * the allegations of the complaint are sustained to the satisfaction of the court or judge, the court or judge shall issue a temporary injunction * * * restraining the defendant and any other person from continuing the nuisance. * * * [I]f at the time of granting the temporary injunction it further appears that the person owning, in control, or in charge of the nuisance so enjoined had received five days' notice of the hearing and unless that person shows to the satisfaction of the court or judge that the nuisance complained of is abated or that he proceeded forthwith to enforce his rights under section 3767.10 of the Revised Code, the court or judge forthwith shall issue an order closing the place against its use for any purpose of lewdness, assignation, prostitution, or other prohibited conduct until a final decision is rendered on the complaint for the requested permanent injunction.

{¶ 53} Further, "the imposition and duration of a permanent injunction to abate a nuisance" is addressed under R.C. 3767.06.  *State ex rel. Rothal* at ¶ 96.  R.C. 3767.06(A) states in pertinent part:

> If the existence of a nuisance is admitted or established in the civil action provided for in section 3767.03 of the Revised Code or in a criminal action, an order of abatement shall be included in the judgment entry under division (D) of section

3767.05 of the Revised Code. * * * The order also shall require the renewal for one year of any bond furnished by the owner of the real property under section 3767.04 of the Revised Code; if a bond was not so furnished, shall continue for one year any closing order issued at the time of granting the temporary injunction; or, if a closing order was not then issued, shall include an order directing the effectual closing of the place where the nuisance is found to exist against its use for any purpose and keeping it closed for a period of one year unless sooner released.

{¶ 54} In *State ex rel. Miller v. Nu-Look Bookstore,* 10th Dist. No. 90AP-939 (Apr. 30, 1991), this court addressed and rejected a contention by the appellants that the trial court was only authorized to close the appellants' business for a maximum of one year, whether or not the court issued a temporary closing order. This court found such contention to be "based on a strained interpretation" of R.C. 3767.06. *Id.* Specifically, in *Nu-Look,* this court held in relevant part:

When a temporary closing order is granted, the court is directed to "continue for one year any closing order" issued previously. R.C. 3767.06. If no such order is issued, the court is directed to close the place "for a period of one year." *Id.* Reading the statute as a whole, it is apparent that "continue for one year" means close the premises for one year from the date final judgment is entered.

{¶ 55} Other Ohio courts have followed this court's interpretation of the statute, including the Ninth District Court of Appeals. Specifically, in *State ex rel. Rothal* at ¶ 98, the court cited with approval *Nu-Look* in holding:

In reviewing R.C. 3767.06(A), it directs the trial court to "continue for one year any closing order" previously issued. This language is unambiguous; it clearly provides that any prior closing order shall be continued for one year. No where in the statute does it provide that the maximum length of a closing order, regardless of its inception, must not exceed one year. Therefore, we find that the trial court properly calculated the commencement date of the one-year closure order issued contemporaneously with the permanent injunction.

{¶ 56} We further agree with appellee that *Rezcallah* did not hold (nor address the issue of whether) the one-year closure period commences from the date a court issues a

temporary restraining order rather than the date final judgment is rendered.  We note that this court has cited with approval the holding in *Nu-Look* in a decision rendered subsequent to *Rezcallah.  See Columbus Inn & Suites* at ¶ 16.  Similarly, other appellate courts have followed the reasoning of *Nu-Look* in decisions rendered subsequent to *Rezcallah.  See State ex rel. Rothal; State ex rel. Cleveland v. Cornell,* 8th Dist. No. 84679, 2005-Ohio-1977 (distinguishing *Rezcallah* and *Cincinnati ex rel. Cosgrove v. Grogan,* 141 Ohio App.3d 733 (1st Dist.2001), and finding "no indication in the language of [R.C. 3767.06(A)] that the total closure of a premises is limited to a one year maximum period, but rather the statute specifically states that the closure may be continued for one year").

{¶ 57} Accordingly, we find unpersuasive appellants' contention that the trial court erred in failing to limit closure to one year from the date of the preliminary injunction. Appellants' third assignment of error is not well-taken and is overruled.

{¶ 58} Based upon the foregoing, appellants' first, second, and third assignments of error are overruled, and the judgment of the Franklin County Municipal Court, Environmental Division, is hereby affirmed.

*Judgment affirmed.*

TYACK and BRUNNER, JJ., concur.

————————————————